UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN L. PALMER, AS LIQUIDATION TRUSTEE FOR THE BAXANO LIQUIDATION TRUST, | ) ) ) ) | |
| Plaintiff, | ) ) | C.A. No. _____ |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| KENNETH REALI and JOSEPH P. SLATTERY, | ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff, John L. Palmer, as Liquidation Trustee for the Baxano Liquidation Trust, by its undersigned attorneys, for his Complaint against the defendants, Kenneth Reali and Joseph P. Slattery alleges:

### Introduction

1.      Plaintiff, as Liquidation Trustee, seeks to recover damages against Defendants, who are former officers of Baxano Surgical, Inc. (the "Company"), for their breaches of fiduciary duties of loyalty and care, resulting in the loss in value of all the Company's assets and market capitalization in bankruptcy and the subsequent creation of the Baxano Liquidation Trust.

2.      Defendants breached their fiduciary duties by repeatedly failing to provide the Board of Directors of the Company (the "Board") with accurate and reasonably achievable projections of the Company's future revenue and revenue growth prospects.  Instead, Defendants provided unreasonable, inflated and unachievable future revenue and revenue growth projections when Defendants knew that their projections would be critical to strategic Board decisions to address the Company's plummeting revenue, increasing rate of cash burn, lack of an adequate

capitalization plan and diminishing ability to obtain cash to sustain operations at high rates of cash burn and, therefore, the Company's entire future viability.

3.     Defendants prepared forecasts and projections of the Company's future revenue and revenue growth for the Company's Board and advisors through various budgets and plans that were without any reasonable basis, and well beyond the bounds of reason, given the Company's historical results, the Company's then-current financial condition, and the challenges facing the Company, all of which were well known to Defendants.   In providing such unachievable, inflated revenue and revenue growth projections to the Board, Defendants acted with reckless indifference to the effect on the Company and its long term viability.

4.     Defendants' unreasonable future revenue and revenue growth projections had the effect of tempering the Board's critical view of the Company's repeatedly worsening financial condition and actual dimming future prospects (instead represented by Defendants to be very bright), and the Board's view of Defendants' ability to manage and resolve the situation.

5.     Having misperceived the Company's future prospects as bright, and the projected time period for the company to generate break-even cash flow and profitability, the Board did not adequately consider restructuring and right-sizing the Company (i.e., by dramatically reducing the level of expenses and rate of cash burn) in a manner appropriate to the Company's actual revenue levels and realistically achievable future revenue and revenue growth prospects.

6.     As a result of Defendants' breaches of their fiduciary duties, the Company's entire value was destroyed as it was driven straight into bankruptcy.

7.     Defendants' improper actions alleged herein were not only grossly negligent and recklessly indifferent, but motivated by self-interest.   Defendants' lucrative compensation packages – which included a generous base salary, opportunity to earn substantial cash bonuses and stock option grants – were keyed to executive compensation levels paid by other

comparable, similarly-sized companies in the medical-products marketplace. Defendants' compensation packages, however, were grossly excessive for the size and revenue level at which the Company actually was operating and which its true, diminished future prospects warranted.

8.      Defendants Reali and Slattery understood the personal risk to them because any major reorganization of the Company and/or reduction of its cost structure would result in a much smaller operation that could not support their then compensation levels – levels that were increasing in each year – and the generous cash bonus compensation they had the opportunity to earn each year pursuant to the Company's Board approved Cash Bonus Plans. If the Company's operations were much smaller, the Board's Compensation Committee would need to use similarly sized comparable companies in setting Defendants' compensation levels.

9.      Defendants' self-interested motivation is reflected in the fact that, while both the Company's revenues and its available cash for operations continually declined over the period at issue here, Defendants obtained compensation and salary *increases* over the relevant time period. And, as further alleged below, Defendant Reali undertook an expensive relocation of the Company that was not necessary.

10.      Defendants' improper actions also were motivated by their self-interest in maintaining their personal reputations within the medical-product business marketplace and the investment community and with the Companies' investors and stock analysts for as long as possible, in the hope the Company's fortunes would turn around before the lights went out. Indeed, as further alleged below, Defendant Slattery told Defendant Reali that "the only friend we'll have is time, and that will be limited by our cash."

## Jurisdiction & Venue

11.      This Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C § 1334 in that the matters alleged herein arise in and/or relate to causes of action

under Title 11. This Court also has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C § 1332 in that the matter in controversy exceeds $75,000 and is between citizens of different States.

12.     This Court has personal jurisdiction over the Defendants pursuant to 10 *Del. C.* § 3114 because the Defendants are former officers of the Company, which was organized under the laws of the State of Delaware, and they have consented to service upon them for any action against them for violation of a duty in their capacity as officers of the Company.

13.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1408 and § 1409.

## Parties

14.     Plaintiff, John L. Palmer, is Liquidation Trustee for the Baxano Liquidation Trust.

15.     Kenneth Reali is an individual residing in Raleigh, North Carolina. Reali was the Company's President and Chief Operating Officer since January 2010. Reali served as the Company's Chief Executive Officer and member of the Company's Board since January 2011. As a former officer of the Company, Defendant Reali has consented to service and this Court's jurisdiction pursuant to 10 *Del. C.* § 3114.

16.     Joseph Slattery is an individual residing in Raleigh, North Carolina. Slattery was the Company's Executive Vice President and Chief Financial Officer since April 2010 and served in that position until his resignation on September 19, 2013. Slattery previously served as a member of the Company's Board from November 2007 until April 2010. As a former officer of the Company, Defendant Reali has consented to service and this Court's jurisdiction pursuant to 10 *Del. C.* § 3114.

<u>Facts</u>

A.      **The Company's History and the Beginning of its Operational
        <u>Troubles, the Details of Which Were Well Known to Defendants</u>**

17.      The Company was founded as a Delaware corporation in 2000 under the name

"XiaMed, Inc."  In February 2003, it changed its name to "TranS1 Inc." and was headquartered

in Wilmington, North Carolina, and later Raleigh, North Carolina.  As a result of a May 2013

acquisition and merger with Baxano Surgical, Inc. (referred to as "Baxano" when referencing the

pre-merger company), the Company again changed its name to Baxano Surgical, Inc., which

remained its name until it filed for bankruptcy protection.

18.      While the Company operated at a loss since its inception, it had been able to fund

operations through proceeds from the sale of publicly traded securities following an initial public

offering in October 2007 and the revenue it earned primarily from its AxiaLIF implant product

and related surgical instruments.  These products were sold to and used by surgeons in

performing spinal surgery, who thereafter received reimbursement for the medical procedure

from private and federally funded insurance companies.  Because  the Company derived its

revenue almost entirely from its AxiaLIF line of related products, the Company's financial

viability (i.e., its ability to continue to sell stock and generate cash flow from operations) was

directly linked to its surgeon-customers' willingness to use the product and ability to obtain

insurance reimbursements for AxiaLIF procedures.  If insurance companies refused to reimburse

surgeons for an AxiaLIF procedure or surgeons otherwise refused to use AxiaLIF, the

Company's revenue and sales would fall.

19.      In January 2009, the American Medical Association changed the Current

Procedural Terminology ("CPT") reimbursement code associated with AxiaLIF procedures and

re-classified it with a "T" Code, i.e., as experimental.   As a result, many public and private

insurers would not reimburse surgeons and hospitals for the procedure using the Company's AxiaLIF product. In addition, in May 2009, AxiaLIF received an unfavorable product review at a national conference of spine surgeons.

20.     As a result of these two events, AxiaLIF product sales and, in turn, the Company's revenues, began falling rapidly. For example, in 2009, the Company's net revenues totaled only $29.8 million which, although it was the Company's historical revenue high point, was $3.6 million (about 12.3%) less than the Company's management had budgeted and planned for in their 2010 budget and plan that they had presented to the Company's board (the "Board").

21.     In 2010, total net revenue fell approximately another $3.7 million to $26.2 million, or about 12.4% lower than the 2009 revenue level. Even worse, the $26.2 million in revenue reflected a $7 million miss (26.8%) from the $33.1 million that the Company's management had budgeted and planned for in their 2010 budget and plan that they had presented to the Company's Board.

22.     The price of the Company's common stock correspondingly fell from a high closing price of $8.60 per share in May of 2009 to a low closing price of $1.76 in December 2010.

23.     As of December 31, 2010, the Company had about $42.5 million in cash, cash equivalents and short term investments. Primarily as a result of collapsing revenue from the AxiaLIF product line, the Company's cash burn rate (i.e., the amount that operating expenses exceeded gross profits) at the time was approximately $4.9 million per financial quarter or about $19.5 million per year. Thus, at the then-present revenue, expense and available cash levels, the Company had enough cash to survive for about eight financial quarters, or through the end of 2012 (assuming net revenue from the AxiaLIF products did not dramatically increase, expenses did not dramatically decrease, and the Company could not raise more money by selling stock).

24.___  Pursuant to a shelf registration statement filed in May 2011, the Company completed a secondary public offering in September 2011 of 6.2 million shares of common stock at a price of $3.25 per share to raise additional cash (the "Secondary Offering"). The Secondary Offering resulted in net proceeds to the Company of $18.3 million. This was the first public sale of the Company's common stock since its 2007 initial public offering.

25.     Also in May 2011, a sealed *qui tam* false claims act lawsuit was filed against the Company alleging, among other things, that it had essentially trained its surgeon and hospital customers to submit false claims and documents to Medicare and the North Carolina State Health Plan to obtain reimbursement for the AxiaLIF procedures under incorrect CTP billing codes.

26.     In July 2011, Defendant Reali conducted a survey regarding surgeons' perceptions of the AxiaLIF product. Among other things, the survey revealed surgeon concerns over billing code and reimbursement issues, product efficacy, and limited indications for use and potential complications. As further alleged below, a memo regarding the results of this survey was created by Defendant Slattery in early 2013. Among other things, Slattery's 2013 memo repeated what Defendants had learned in July 2011 from the survey: AxiaLIF was "a technology that will take a ***sustained and consistent sales and marketing effort for significant adoption***." (Emphasis added).

27.     In October 2011, the Company's sales and surgeon training practices related to AxiaLIF also became the subject of an investigation by the United States Department of Health and Human Services, Office of Inspector General ("OIG").

28.     While the Company publicly disclosed that it had received a subpoena from OIG, it did not disclose the nature or extent of the OIG's investigation.

29.     Following the Company's disclosure of the OIG subpoena, the Company's stock price declined and, by late October/early November 2011, closed at a new low of $1.50 per

share.  Importantly, the investing public was not aware of the severity of the Company's regulatory issues or of the fact that the Company's surgeon and hospital customers were leaving in droves, in part because the customers viewed the Company and the AxiaLIF product as tainted.

30.     The Company's net revenue declined even more severely in 2011 to just over $19.1 million, reflecting a $7 million drop (27%) from the 2010 level.  Again, this was primarily the result of lost AxiaLIF sales and the lack of surgeons who would use the products.  Incredibly, this decline constituted a massive $11 million revenue miss (36.4%) from the unreasonable $30 million in net revenue that Defendants Reali and Slattery had presented to the Company's board in their 2011 budget and plan.

### B.     The Defendants' Handsome Salaries, Which Were Dependent on the Company's Operational Size

31.     Defendants Reali and Slattery were paid base salaries of $360,000 and $293,550, respectively, in 2011 and under the Company's 2011 Cash Bonus Plan were eligible to earn lucrative cash bonuses of up to 50% and 40%, respectively, of their base salaries under certain performance objectives.  These compensation levels, along with other compensation such as stock option awards and various cash bonus plans, were premised in part on the market capitalization of the Company as compared to the compensation packages for executives at similarly sized medical device "peer group" public companies.

32.     As of December 31, 2011, the Company had about $44.7 million in cash, cash equivalents and short-term investments.  This amount was primarily the result of the Company's Secondary Offering that had raised about $18.3 million in proceeds.  As of the end of the fourth quarter 2011, the Company's cash burn rate was approximately $4.6 million per financial quarter, or about $18.3 million per year.  At the then-present revenue, expense and available cash

levels, the Company had enough cash to survive for about nine financial quarters, or until the first quarter of 2014, unless net revenue from the AxiaLIF products dramatically increased, expenses dramatically decreased or the Company could raise more money by selling stock. Absent the proceeds from the Secondary Offering, the Company would have had only about $26.4 million in available cash and cash equivalents at year end 2011, such that the Company would have had only enough cash to survive for about five financial quarters, or until the first quarter of 2012, absent a dramatic revenue increase, expense decrease, or another cash raise. Based on the Company's poor 2011 year-end results, Defendants Reali and Slattery earned $22,500 and $23,484, respectively, in cash bonuses under the 2011 Cash Bonus Plan, having missed their revenue and available cash targets.

33.     For 2012, Defendants Reali and Slattery secured raises from their 2011 base salaries to new salary levels of $370,000 and $298,443, respectively.  Reali and Slattery also received payments of $90,000 and $58,710, respectively, under a Retention Bonus Plan approved in 2011, as well as payments of $99,975 and $61,381, respectively, in non-equity incentive plan compensation.  In addition, Defendants Reali and Slattery also were awarded a total of $352,800 and $123,480, respectively, in stock options (an expense to the Company), for total 2012 Compensation of $912,775 for Reali and $690,701 for Slattery.

**C.      While the Defendants' Salaries Continued to Swell, the Company's Revenues and Future Prospects Continued to Decline**

34.     The clear trend of collapsing AxiaLIF product revenue and loss of the Company's core surgeon and hospital customer base continued after 2011 and through 2012.  As a result, the Company's revenues, available cash and ability to raise cash rapidly deteriorated, its future prospects began to grow dimmer, and its options for long term viability became more limited with the continuing revenue shortfalls.

35. Defendants Reali and Slattery well understood the critical relationship between the Company's actual and projected AxiaLIF revenues, on the one hand, and the Company's future prospects and ability to obtain enough cash through future sales of common stock to meet its cash burn needs, on the other hand. Defendants also knew the importance of the Board's understanding of whether the AxiaLIF product would generate enough income to justify the Company's continued high rate of cash burn or warranted adequate Board consideration of, and action to undertake, a major reorganization to reduce the Company's cost structure.

**D. Defendants Presented an Unreasonable, and, Therefore, Misleading, Long Range Plan for the Company's Future Revenue and Revenue Growth Prospects to Avoid Downsizing by the Board**

36. During April 2012, Defendants Reali and Slattery created and provided to the Board an unrealistic long range plan based on future revenue and revenue growth assumptions for AxiaLIF that had no reasonable basis in the facts known to them, and were unachievable. Simultaneously, Defendant Reali embarked on a plan to supplement, if not replace, the Company's lost AxiaLIF revenue base through the acquisition of other product lines or another company that would cover for AxiaLIF's long term diminished prospects.

37. Indeed, in an April 24, 2012 email, Defendant Reali expressed his intention to expand the Company's product portfolio or acquire another business with an existing product line. Defendant Slattery, however, stated his concern that such a "strategy is currently missing a capitalization plan that supports" it. In other words, the Company did not have the available funds or current ability to raise the funds needed to successfully make such an acquisition. Nevertheless, Defendant Reali began to embark on a screening process of potential acquisition targets – with Baxano eventually being identified later in the summer as the most viable option.

38. Given the Company's deteriorated financial condition and declining future prospects, lack of an adequate capitalization plan, the interrelationship of the Company's actual

revenue to its rate of cash burn, the amount of available cash until a cash "dry well," and Defendant Reali's intent to pursue an acquisition strategy, Defendants knew or should have known that their future projections for the Company's revenue and revenue growth rates would be critical to important and related decisions by the Company's Board. These Board decisions included whether to continue to raise cash, reduce and right size the Company's operations to actual revenue levels that stopped the cash burn, or to engage in any significant transactions, such as the purchase of another company or product line.

39.     Notwithstanding what was or should have been Defendants' knowledge of the importance of the accuracy of their revenue forecasts, an April 23-24, 2012 email string between Defendants' Reali and Slattery discusses their adjustments to AxiaLIF revenue growth assumptions in their base case for the long range plan. The email string shows Defendants trying to justify to themselves the revenue growth assumptions for AxiaLIF that they simply pulled out of the air, without any reasonable basis, to enable them to present to the Board a rosy view of the Company's future prospects that justified the current size of the Company's operations and large cash burn rate.

40.     In the April 23-24, 2012 email exchange Slattery revealed the rationale for inflating the AxiaLIF revenue assumptions: "I expect that anything less will not be accepted by the board given our investment plan, and performing less than that will be a big disappointment to investors who have waited for this day, and that will make fundraising next year more challenging . . . . *The value of this company remains the potential for AxiaLIF.*" (Emphasis added). Defendants clearly knew the unreasonableness of the AxiaLIF revenue assumptions, which Defendant Reali even acknowledged were too high, suggesting instead a lower 30% AxiaLIF case growth projections for 2013 that "*feels more right to me not from any quantifiable way* but just knowing what it will take to restart and the challenges in the spine

market – we are going to need to go broad to get cases and a lot of depth no longer exists – ***this
is going to take time and money***." (Emphasis added).

41.     Defendant Reali further commented in the April 24 email discussion: "[f]or 2014-
17 – would model 30% growth per year."  In response, Slattery explained that "[t]he model has
40% AxiaLIF case growth.  If I change nothing, then the Dec 2014 AxiaLIF case count is 184,
which is pretty close to the run rate when you joined [the Company]. . . . Do those seem
unreasonable?  Comments from the first bullet apply – ***if we don't think we can grow this
business 40% then we don't have a license to hunt.  If it is going to be much less than that,
then we don't have a compelling investment profile and we need to rethink our cost structure***."
(Emphasis added).

42.     Rather than tell the true facts, Reali agreed to Slattery's inflated revenue
projections, instructing Slattery to "leave the sales numbers as is," now that he understood
Slattery's rationale and intent to tell the Board something that would justify the Company's
continued size and fundraising efforts.  In contrast, Reali instructed Slattery to "make damn sure
the S&M [sales and marketing] spend is correct. . . .  I would rather overemphasize this as I do
feel we are going to need a lot of muscle to get us over the hump for many reasons and short
changing this will not help us in the end.  ***I would rather be very realistic <u>on this</u>***." [Emphasis
added].  That statement reflected that Defendants knew they were not being realistic on the other
assumptions in the long range plan, particularly their future revenue and revenue growth
forecasts for AxiaLIF.

43.     Indeed, discussing the inter-relationship between the sales and marketing expense
assumptions in the long range plan, the inflated AxiaLIF revenue level projections and the
Company's future cash needs, Slattery revealed how their manipulation of these numbers would
affect the Company's projected cash needs.  "So, if we increase the S&M spend, and lower the

revenues as you suggest above, it will dramatically increase the cash requirements. His continued comments show that Defendants were trying to find a combination of assumptions that would present the Board an ideal, rather than truthful scenario: "[W]hat is provided here is a high enough level of investment that we would underperform the average of the comps. If we have to increase it further, it will exacerbate the issue. It does make sense, as I do not believe that we can deliver this kind of growth with such a limited increase in S&M spend. This is the big issue in the long range plan. We could easily put a scenario together that says we need $100M in capital to get to cash break even." This contrasts with Slattery's "punchline" conclusion, based on the inflated AxiaLIF revenue assumptions, that the Company would "need to raise $62M over the years[] and . . . another $14M proceeds from stock options."

44.    Finally, the April 23-24 email chain further reveals that, while Reali wanted to expand the Company's product portfolio because "[t]oo many eggs in AxiaLIF will kill us and it is too risky," Slattery advised that "Our strategy is currently missing a capitalization plan that supports it. . . . ***To me that means putting off investment that will take longer than a couple of years to get a payback until we have the cash to support it***. (Emphasis added).

45.    Defendants provided the final Long Range Plan (Spring 2012 Update) (hereafter the "2012 Long Range Plan") to the full Board at its regular meeting held on May 3, 2012. The Long Range Plan reflected Defendants' previously overestimated projected 2012 net revenue of about $17.6 million and, as follows, Defendants' unrealistic and inflated revenue forecast for the 2013 to 2017 period:

|  | 2013 Fcst | 2014 Fcst | 2015 Fcst | 2016 Fcst | 2017 Fcst |
|---|---|---|---|---|---|
| **Total Revenue** | $27.9M | $37M | $49.6M | $66.8M | $90M |
| **% increase over prior year (rounded)** | 58.9% | 32.6% | 34.0% | 34.8% | 34.7% |
| **Income (loss) from operations (rounded)** | ($22.4M) | ($20.1M) | ($15.6M) | ($8.6M) | $2.1M |

46.     The full Board was not aware that Defendants' future revenue and revenue growth projections, for AxiaLIF in particular, were wildly optimistic and without a reasonable basis. Nor was the full Board aware that Defendants had presented such inflated revenue projections so that the Board would perceive a much more favorable view of the Company's future prospects than the Company reasonably could achieve, especially given the problems with its customer base and lack of adequate cash to turn those problems around anytime soon.

47.     The overly optimistic and unreasonable revenue projections in the 2012 Long Range Plan also substantially tempered the adverse information about the Company's current financial condition that Defendants provided to the full Board on May 3, 2012 in an accompanying PowerPoint presentation (the "PowerPoint Presentation").

48.     Among other things, the PowerPoint Presentation disclosed a variety of adverse information about the Company's current financial condition, e.g. that "Current cash levels [were] inadequate to fund the business through end of 2013 (+/-)"; "Expect to need to raise at least ~$20M in the late 2012/early 2013 timeframe"; "All scenarios point to roughly the same amount"; "Will need to raise another at least $20M in the late 2013 (going concern)" and "Should raise $40-50M to commit to cash flow b/e in offering." The PowerPoint Presentation also reflected that "Catalysts to drive [investment] interest [were] limited between now and mid-2013," but that Defendants "Expect to have a clear growth story in place late 2013/early 2014."

49.     Another portion of the PowerPoint Presentation revealed the results of a survey conducted for the Company of spine surgeons' view of the AxiaLIF product and their willingness to use it. Among other things, it noted the "Top reasons for not using AxiaLIF" as including the "T-Code/Reimbursement" issue, "Limited indications" for the product's use and the poor "Clinical Outcomes/Fusion Results" from the product.    Thus, the PowerPoint Presentation also reflected that, notwithstanding the Defendants' anticipated need for cash (based

on their inflated AxiaLIF revenue numbers, which need for cash would be even greater if the revenue projections were realistic), the Defendants currently did not have a clear "growth story in place" and the "Catalysts to drive [investment] interest" were limited until mid-2013.

50.     As Defendant Slattery explained in his accompanying CFO Presentation to the Board addressing the continuing loss of the Company's surgeon customers, "We have no signs at this point that we have reversed the trends in the business, where we are seeing a negative feedback loop of lower business leading to rep turnover leading to lower business, although headcount was more stable through the 4th and 1st quarters. We are beginning to see more cases from our reimbursement coverage wins, but the numbers are small relative to the overall size of the business."

51.     At the time Defendants presented the 2012 Long Range Plan, they also were concerned that the Company would receive a "going concern" opinion from PricewaterhouseCoopers LLP ("PWC"), the Company's registered independent public accounting firm. Defendants knew this likely would be coming in connection with PWC's audit and report on the Company's year-end 2012 financial statements and information (which would be filed with the Securities and Exchange Commission ("SEC") on Form 10-K in about March 2013).

52.     As explained in the standards of the Public Company Accounting Oversight Board, AU Section 341.01 ("The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern"):

> Continuation of an entity as a going concern is assumed in financial reporting in the absence of significant information to the contrary. Ordinarily, information that significantly contradicts the going concern assumption relates to the entity's inability to continue to meet its obligations as they become due without substantial disposition of assets outside the ordinary course of business, restructuring of debt, externally forced revisions of its operations, or similar actions.

53.     And, on top of all this, the Company still faced the consequences of the ongoing OIG investigation into the Company's sales and training practices relating to AxiaLIF, which Defendants were unable to quantify.

54.     Consistent with the 2012 Long Range Plan, however, Defendants' PowerPoint Presentation also presented to the Board a misleading and overly optimistic picture of the Company's future prospects.  This was done through the inclusion of three scenarios for the Company's future prospects and cash raise needs: a "Base Case," a "Downside Case" and an "Upside Case." In sum, the three scenarios present a relatively narrow range of financing needs over a relatively narrow time period range, thereby lending more credence to the Base Case scenario.  However, the Base Case scenario also was premised on Defendants' inflated AxiaLIF revenue and revenue growth assumptions, not reasonably achievable revenue and revenue growth assumptions.

55.     Thus, the Base Case included a "2013 Revenue Assumption" of 49% AxiaLIF case growth and 2014-2017 revenue assumptions of 35% revenue growth year over year.  Based in part on these assumptions, Defendants projected the Company's cash raise needs at a total of approximately $80 million, comprised of $67 million raised over the four-year period between 2012 and 2015 and an additional $13 million raised from the exercise of stock options and employee stock purchase plans.

56.     In juxtaposition to the "Base Case," Defendants provided a "Downside Case" that included no specific revenue or revenue growth forecast numbers, and just noted Defendants' assumptions that: "AxiaLIF case trend continues slow decline"; "Slightly slower lateral case growth" and "For 2012, slower AxiaLIF uptake (and from a lower base) due to payer coverage gaps."  Under this Downside Case scenario, Defendants estimated the Company's total "Cash

raise needs" of about $97 million through 2016, or only about $17 million more than Defendants' Base Case, but over a longer five-year period. Without quantifying the "Downside Case" revenue projections and suggesting that only an additional $17 million was needed over a longer time period to profitability, the Downside Case indicated to the Board the inaccurate appearance of minimal risk to the Company if AxiaLIF revenues and "case trend continue[d] [their] slow decline," a fact that Defendants knew or should have known would happen (and did in fact happen).

57.     In juxtaposition to both the "Base Case" and the "Downside Case," Defendants provided an "Upside Case" that included the following factors positively affecting the Company's revenue (but again, notably, no revenue assumption amounts are quantified): "Faster AxiaLIF uptake due to payer coverage wins, strong execution (~ 50% unit growth)." Under this Upside Case scenario, Defendants estimated the Company's total "Cash raise needs" of about $79 million through 2015.

58.     Curiously, the various cash raise needs identified by Defendants under the different case scenarios appear to have been pegged by Defendants within a range of expected cash raise needs for comparable medical device companies experiencing the type of revenue growth Defendants were incorrectly projecting to the Board, not the much reduced levels of cash raise needs for comparable companies – like the Company – that had a product with declining revenues and a disappearing customer base.

59.     In light of what Defendants' knew about the reasons for the loss of AxiaLIF sales, i.e., that the AxiaLIF product and the Company were "tainted," that most of the Company's surgeon and hospital customer base had left, and that the Company's AxiaLIF sales were caught in a "negative feedback loop," Defendants' inflated revenue and revenue growth projections in the 2012 Long Range Plan and Base Case scenario were without a reasonable basis and were

misleading to the full Board because they presented a materially inaccurate and overly optimistic view of the Company's future prospects.

60.     On May 24, 2012, Defendant Slattery warned Defendant Reali to put off a planned relocation of the Company from Wilmington, North Carolina, to Raleigh, North Carolina, "given the cash situation." As Slattery advised Reali, they would have to be able to answer the question from investors:

> If the markets are closed and we do not have a clear path to cash, what will we have to do with this business in August/September to extend the cash reach?" We're back to Plan A, A1 and Plan B approach, and the less cash we have the more likely we'll be forced into a Plan C (distressed sale of the company). If the markets close and the [Company's stock] price drops below $2 . . . then I doubt the board will want us to raise any money. The only friend we'll have is time, and that will be limited by our cash.

Of course, the amount of cash the Company would have available greatly depended on the revenues derived from AxiaLIF.

61.     As Spring 2012 progressed, the Company's options continued to narrow, while its financial situation continued to deteriorate. This is documented in a June 12, 2012 email from Defendant Slattery to Defendant Reali. Slattery warned:

> We will run out of cash in Oct/Nov [2013], all else equal, excluding any OIG settlement. . . . I am concerned about entropy here ([stock] price so low we can't raise enough money due to [the Company's] public float caps), and we should have a sense of urgency about adapting to the situation. That means trying to raise as much as [cash] possible, as soon as possible, *and* cutting back our [cash] burn as much as possible to extend our cash runway 1-2 quarters. The only thing we can control right now is our burn, and our revenue outlook for the rest of this year . . . is bordering on optimistic.

Slattery continued:

> We need to cast a wide net of how to keep this business capitalized. That includes discussions with strategics. If the concept of an equity investment does not sound feasible, it cannot hurt to include it in a list of options where we are welcoming the concept of equity investment, license of international distribution rights, co-branding AxiaLIF or some other transaction that is of interest to strategics. Since that would take 6-9 mos to effectuate, if we are unable to

adequately finance the business by next March, that is the only option we'll have available at that time so we should prepare for that.

62.     In the June 12 email, Slattery also provided his view of what should be discussed at the next board meeting in August.  Among other things, Slattery advised that he and Reali should tell the Board that the Company's revenue "could grow more akin to the 'upside' long range plan [i.e., the Upside Case presented to the Board at the May 3 meeting], but the cash need was basically consistent with what was reported at the last meeting."  Thus, Slattery suggested that they "[g]o over" with the Board the Upside Case as the "'new' long range plan." Simultaneously, however, Slattery also advised Reali that they should tell the Board that they "need to explore (a) scaling back the business and (b) interacting with strategics as back-up plans. . . . I appreciate the objection to the last bullet, but based on the current assessment, we have to escalate contingency plans.  By the time we report in August, we'll be getting direct questions about the need to raise cash."

63.     Critically, Slattery's June 12 email also revealed Defendants' early knowledge about a substantial and risky $1 million "stocking order" sales transaction the Company was considering with a Chinese distributer that eventually was consummated in the fourth quarter of 2012.  That $1 million transaction helped Defendants avoid an even larger revenue miss relative to Defendants' budget and revenue projection of $17.6 million (2012 net revenue, including the $1 million channel stuffing transaction, totaled just $14.6 million): "I think that if we can get a $1M order from China, we should take it.  Whatever the risks are, they will be offset by higher revenue, better cash flows over the next six/nine months, and optimism about the business."

64.     Notably, the Company had previously engaged in other similar "stocking transactions" that appear to be channel stuffing activity, particularly within the Company's international division.

65.    But, with respect to the China transaction in particular, the propriety of recognizing the entire approximate $1 million of revenue, i.e., anything beyond the initial payment of approximately $500,000, was questionable at the time because there was no persuasive evidence that collection was reasonably assured for the remaining balance of the approximate $500,000 amount owed to the Company.

66.    In a July 25, 2012 email, Defendant Slattery acknowledged the continuing deterioration of the Company's year-end 2012 available cash position to just $20.0 - $20.5M due to lower than projected revenue and higher than budgeted expenses.  As Slattery stated "[T]hat creates a problem for the thesis of extending the cash runway into the beginning of 2014.  I'd really like to go into the board meeting with a plan on how we get back to $22M in cash at year end. We have our cost review tomorrow, and we could try to close the gap there, but I think it is going to take some pretty major 180s to make that happen. . . ."

67.    On August 1, 2012, the Company's Audit Committee met, during which PWC specifically advised "of the timing and consideration of disclosures surrounding [a] going concern" opinion in connection with PWC's audit and report on the Company's year-end 2012 financial information and statement to be filed with the SEC on Form 10-K.  Because a going concern opinion by PWC was imminent – and would reflect that the Company's recurring losses and negative cash flows from operations raised substantial doubt about its ability to continue operating through 2013 – the price of the Company's public traded common stock was likely to decline, making it that much more difficult and dilutive for the Company to raise enough additional capital through sales of stock to fund operations for an adequate period of time.

68.    At the August 2, 2012, full Board meeting, Defendants Reali and Slattery discussed some of the risks in the Company's existing business, including the continuing decline in revenue, loss of surgeons and hospitals, and "Record AxiaLIF cancellations in June (38%)."

Defendant Reali's presentation acknowledged that "[t]he AxiaLIF base continues to be the greatest risk," and explained that:

> due to budget constraints we have decided to forgo the rebranding exercise for this year. After dissecting the business and the surgeons we will reengage with the category I code we feel we can wait a year to rebrand. Much of 2013 will be focused on regaining past customers who fell off due to reimbursement rather than new users who view AxiaLIF as a tainted name.

69.     In connection with the Company's financing needs, Defendants also discussed some of the Company's alternatives, including their discussions with a number of private equity investors and strategic parties, noting in the Board presentation that, "in addition to conventional institutional investors, we have pursued venture/crossover funds and signed an NDA . . . with follow up meetings scheduled this week."

70.     Once again, however, Defendants continued to project undue optimism to the Board about the Company's future prospects, particularly relating to the revenue forecast from the AxiaLIF product line.  Again, Defendants did not adequately advise the Board of the need to materially reduce their 2012 Long Range Plan, including the Base Case scenario they previously provided to the Board in the PowerPoint Presentation at the May 3 meeting, despite knowing of even more revenue misses, that increased expenses were causing an even larger increase in the rate of cash burn and, moreover, of the "negative feedback loop" relating to the Company's sales efforts, particularly for AxiaLIF.

71.     Instead, Defendants plainly represented to the Board that the Company could achieve the incredibly optimistic Upside Case discussed at the May 3 board meeting and then presented the board with their "Long Range Plan (June 2012 Update)" that reflected it (hereafter the "Updated 2012 Long Range Plan").  While the Updated 2012 Long Range Plan reduced Defendants' previously overestimated projected 2012 net revenue of about $17.6 million to just

$14.7 million, Defendants essentially doubled down on their unreasonable future projections and inflated revenue forecast for the 2013 to 2017 period as follows:

| | 2013 Fcst | 2014 Fcst | 2015 Fcst | 2016 Fcst | 2017 Fcst |
|---|---|---|---|---|---|
| **Total Revenue (rounded)** | $24.3M | $41.9M | $69.7M | $107.6M | $152.7M |
| **% increase over prior year (rounded)** | 65.3% | 72.4% | 66.2% | 54.5% | 41.9% |
| **Income (loss) from operations (rounded)** | ($19.9M) | ($14.8M) | ($4.7M) | $12.6M | $34.8M |

72.     The full Board was not aware that Defendants' Updated 2012 Long Range Plan revenue projections were even more wildly optimistic than those presented at the May 3 meeting in the prior 2012 Long Range Plan.  The full Board also was not aware that Defendants had again misstated the revenue projections in a manner that presented the Board an even more favorable long term view of the Company's future prospects than the Company reasonably could achieve given the problems with its customer base and lack of cash or a capitalization plan to deliver such incredible results.  Thus, the overly optimistic and unreasonable revenue projections in the Updated 2012 Long Range Plan once again tempered the adverse information about the Company's current financial condition that Defendants also provided to the full Board at the August 2, 2012 board meeting.

73.     Indeed, apparently to support their overly optimistic view of the Company's prospects, Defendants began including in the August board package a number of selected analyst reports that, consistent with Defendants' Long Range Plan, echoed Defendants' expectations for increased revenues in late 2012 and beyond.  And, consistent with the analysts' lower 2012 year-end revenue estimates, Defendants similarly lowered those estimates from what they had initially forecasted in their 2012 Budget and Plan (the "2012 Budget") previously provided to the Board.

74.     Given Defendants' Updated 2012 Long Range Plan, the revenue projections for AxiaLIF, the increase in those future projections over what Defendants had provided to the Board at the May 2, 2012 Board meeting, and Defendants' representations that the Company would achieve the Upside Case, the Board continued to have a fundamental misperception of the Company's future prospects, and did not have the critical adverse information about the Company's true, dismal, future prospects to adequately decide whether to consider alternatives such as a disposition of assets outside the ordinary course of business or substantial revisions to the Company's operations to right size them as a way of addressing the Company's growing financial difficulties.

75.     In presenting the unreasonable forecast information to the full Board in the manner they did, while knowing that the AxiaLIF revenue and revenue growth projections did not have a reasonable basis, Defendants breached their fiduciary duties to the Company of loyalty and care. Similarly, Defendants also wasted the Company's assets.

76.     In light of the Company's historical losses, deteriorated financial condition, high rate of cash burn, unknown consequences of the outstanding OIG investigation and the lack of a compelling "story" to tell investors, Defendants' actions improperly colored the Board's view of the Company's future prospects in an unrealistically favorable way, thereby presenting an unwarranted reason for the Board to approve Defendants' long range plans and not undertake the necessary measures to avoid eventual bankruptcy, such as a major revision to the Company's operations, reduction in operating structure and slashing of expenses.

77.     Defendants understood that a dramatic reduction in the size of the Company to align expenses with revenue and eliminate cash burn could result in a substantial reduction of Defendants' lucrative compensation and cash bonus packages that were keyed to comparably

sized companies, and the additional adverse impact on Defendants' personal reputations in the industry.

78.    Had Defendants not included the inflated revenue forecasts in their 2012 budget and long range plans, but instead presented realistic and achievable revenue forecasts based on the prior downward revenue trends in AxiaLIF that the Company actually experienced, the full Board would have been able to properly evaluate the Company's actual future prospects in light of its adverse current financial condition and could have adequately considered alternative actions and made informed decisions to save the Company's value.

79.    Similarly, had the full Board known that Defendants' critical revenue and revenue growth assumptions in the 2012 budget, their long range plans, and the three scenarios in the PowerPoint Presentation were overstated to present a better picture of the Company's future prospects, the full Board could have heavily discounted Defendants' future projections and taken corrective and remedial action to right size the Company.

80.    Right sizing, at this point, easily could have been achieved by the Board since the Company had gross profits, in 2012, of approximately $10.3 million in revenue, on about $14.6 million in revenue, reflecting about a 71% gross margin.  Substantially reducing the Company's total operating expenses of approximately $40 million, the bulk of which was for sales, marketing, general and administrative expenses, and research and development costs, would have restored the Company to profitability.  But the Board did not appreciate the need for this fix because it relied on Defendants' misrepresentations about the Company's bright future revenue and revenue growth prospects.

### E. Defendants Presented to the Board Unreasonable, and, Therefore, Misleading, Future Revenue and Revenue Growth Prospects in Advance of the Baxano Merger

81.     On August 23, 2012, the Company's Board held a special meeting to discuss a possible acquisition of Baxano. The Board encouraged Defendant Reali to initiate communications with an investor in Baxano. This resulted in a non-disclosure agreement, the commencement of discussions and preliminary due diligence of Baxano.

82.     On October 10, 2012, the Company engaged the financial advisory firm Stifel, Nicolaus, Weisel ("Stifel") to act as the exclusive financial advisor to the Company in connection with its analysis of a potential acquisition of Baxano and to provide to the Company's Board of Directors a fairness opinion in connection with any proposed transaction. As further alleged below, Stifel's fairness opinion was subsequently delivered to the Company on March 1, 2013 and incorporated into the Company's May 9, 2013 Proxy Statement filed with the SEC (the "Proxy").

83.     On October 18, 2012, a special meeting of the Board was held to discuss the status of the proposed Baxano transaction.  At the meeting, representatives from Stifel presented to the Board their analyses of the Company, Baxano and the combined company (the "Stifel Presentation"), based on projections provided by Baxano's management regarding Baxano (and as adjusted by Defendants), and revenue projections and other information provided by Defendants regarding the Company on both a stand-alone basis and a *pro forma* basis (as if combined with Baxano) (the "Pro Forma Projections").

84.     The Stifel Presentation reflected that on a *pro forma* basis, the combined company's revenue would grow an astonishing ***150% in 2013 from 2012 actuals, an additional 100% in 2014, another 67% in 2015, followed by 47% in 2016 and 37% in 2017***.  This translated into projections of total revenue for the combined company (i.e., on a *pro forma* basis)

of $37.1 million in 2013, $74.1 million in 2014, $123.7 million in 2015, $181.3 million in 2016, and $248.8 million in 2017.  Thus, the Stifel Presentation also reflected that these revenue levels would drive net income from operations over the same period such that the combined company would be cash flow positive (and profitable) by 2015 as follows: 2013 net loss of $25.7 million, 2014 net loss of $12.3 million, 2015 net income of $11.6 million, 2016 net income before taxes of $40.5 million, and 2017 net income before taxes of $76.5 million.

85.     Based on what Defendants knew about the Company's "tainted" AxiaLIF product line, the loss of its customer base, and the repeated substantial misses of Defendants' revenue projections in prior budgets, Defendants' revenue and revenue growth projections for the Company on a stand-alone and *pro forma* basis were not reasonably achievable and, therefore, lacked a reasonable basis.

86.     Absent knowledge of the lack of a reasonable basis for Defendants' revenue projections, and instead relying on the skewed nature of those projections, the Company's Board was unable to adequately evaluate Defendants' strategy to acquire Baxano, particularly since the Company did not have an adequate long term capitalization plan in place and given the Company's actual declining revenues and deteriorated financial condition. Thus, the Board approved Defendants' strategy to acquire Baxano and Defendant Reali's request for authorization to deliver to Baxano a non-binding letter of intent to enable the commencement of due diligence.

87.     On November 1, 2012, the Company held its regular board meeting to discuss the Company's financial results from the third quarter of 2012.  At the meeting Defendants provided an update on Baxano and a discussion of PWC's intended going concern opinion on the Company's financial statements for the year ending December 31, 2012 to be filed with the SEC. Among other things, Defendant Slattery addressed the Company's substantial revenue miss for

the quarter noting, "Current quarter-to-date revenue was $3.2M, which was unfavorable to plan by $1.3M, or 28%, as our AxiaLIF surgeon base continued to decline while our overall surgeon total including VEO was steady at 89 in both Q3 and Q2."

88.     Addressing AxiaLIF's results specifically, Defendant Slattery stated:

In the third quarter, we saw a 15% sequential drop in our case count, with single level cases dropping 16% and 2-level cases decreased by 12%. October is trending at 55 cases which is approximately the Q3 monthly average. . . . On a sequential basis, the declines in both cases and active surgeons have remained high. On a year-over-year basis, active surgeons declined significantly while case losses continued at high levels. We have no signs at this point that we have reversed the trends in the business.

89.     Although Defendants presented to the Board a revised 2012 budget (the "Revised 2012 Budget") that was consistent with the reduced 2012 revenues set forth in the Updated 2012 Long Range Plan provided to the Board at the August board meeting, Defendants still did not retract their overly optimistic projection of the Company's future revenue and revenue growth set forth in the updated Long Range Plan or in the Pro Forma Projections (relating to the Baxano transaction) provided to the Board on October 18, even though Defendants lacked a reasonable basis for such projections based on Defendants' knowledge about the Company's "tainted" AxiaLIF product line, loss of its customer base, repeated substantial misses of Defendants' revenue projections in prior budgets, and that there were "no signs at this point that we have reversed the trends in the business."

90.     Had Defendants properly advised the Board of the Company's true diminished future prospects, or that their future projections lacked a reasonable basis, and instead recommended that the Board permit them to right size the Company in a manner appropriate for its reasonably expected reduced revenue levels, a substantial portion of the Company's assets and market capitalization could have been saved.  Additionally, the Company's accumulated deficit could have been capped, and it likely would not have needed to eventually take on debt in

December 2013 secured by all of its assets, resulting in a forced sale in bankruptcy of all its assets.

91.     As alleged above, right sizing easily could have been achieved by the Board since the Company had gross profits in 2012 of approximately $10.3 million on revenue of about $14.6 million, reflecting about a 71% gross margin.  The Board could have right-sized the Company to profitability, had it known of the Company's true diminished future prospects, by reducing the Company's total operating expenses. The Board did not appreciate the need to do this because Defendants had misrepresented the Company's future prospects to be much brighter than they actually were and that the Company only needed enough cash to bridge the time gap to reach profitability.

92.     On December 14, 2012, Defendants and Baxano's management began discussing the need for financing to support the combined companies post-merger.  Baxano's management indicated that certain Baxano stockholders had expressed interest in participating in a potential financing of $15 million.

93.     On December 20, 2012, the Board held another special meeting in which Defendants presented their 2013 Budget and Plan (the "2013 Budget").  The 2013 Budget revealed that Defendants anticipated actual total net revenue for 2012 of just under $14.6 million, reflecting a 24% decline from 2011 net revenues of $19.2 million and nearly a $3 million revenue miss from the $17.6 million Defendants had initially projected in their 2012 Budget (a 17% miss), but just under the 2012 revenue Defendants projected in their Updated 2012 Long Range Plan.  However, that revenue number included the questionable $1 million channel stuffing transaction with a Chinese distributor that Defendants anticipated earlier in the year and knew was "risky."

94.     Indeed, the Company only ever received about half of the payment, and the products sold apparently still remain held in Chinese customs to this day while the Company itself was forced to fully reserve approximately $500,000 for the balance of the transaction value. Absent that transaction, the Company's 2012 revenues would have been materially lower and Defendants' would have materially missed even their reduced 2012 revenue projections contained in their Updated 2012 Long Range Plan.

95.     The 2013 Budget also reflected that, as of December 31, 2012, the Company only would have available cash of approximately $21.5 million on a stand-alone basis, enough to fund operations only through the end of 2013.

96.     On December 26, 2012, the Board held a special meeting to discuss the OIG settlement negotiations and approved a settlement for $6 million that would not be completed until mid-2013. The funds to repay this settlement, whether paid in full or on an extended plan, would clearly have a material impact on the Company's rate of cash burn and available cash for the continuation of operations.  Indeed, as of year-end 2012, the Company's cash burn rate had leaped to approximately $7.5 million per financial quarter or about $29.9 million per year, primarily as a result of collapsing revenue, increased expenses and accruals relating to the OIG settlement.   At then-present revenue, expense and available cash levels, the Company had enough cash to survive for only about three financial quarters, or until the third quarter of 2013, unless net revenue from the AxiaLIF products dramatically increased, expenses dramatically decreased or the Company could raise more money by selling stock.

97.     In a January 5, 2013 email, Defendant Slattery outlined his concerns and analysis of the Company's cash burn rate and cash needs relating to the timing of the Baxano transaction. Importantly, Slattery acknowledged that they likely would not be able to reduce Baxano's approximate $1 million per month cash burn in the first year, that at best the combined company

only would have between 7 to 8 months of cash post-merger, not including the OIG settlement payments, and that because they "already scrubbed out much of the slack in our [Defendants'] plan . . . if we come up short on revenue, the runway will be shorter. . . . I think the Board's comment that we should get as little cash from them as possible was very one-dimensional. We need as much cash as possible from this deal. Short of $15M, *we will [] have such a short cash runway it will force our hand on a financing, and will be a factor in retention, where I am more sensitive to retaining their key people to protect the revenue stream*. My gut is that cash burn will be higher than we think post-deal, at least for the first 6-12 mos." (Emphasis added).

98. As alleged above, a critical component to the Company's rate of cash burn is the amount of revenue it can achieve. Any overstatement in forecasted revenue that does not come to fruition would result in a corresponding increase in cash burn, absent other expense savings. Defendants fully understood this and Defendant Slattery's comment on the Board's view of "as little cash as possible from this deal" reflected the Board's overly optimistic misperception at the time of the Company's future revenue and revenue growth prospects and corresponding cash burn and need for cash post-merger, given Defendants' previous unreasonable revenue and revenue growth forecasts in the 2012 Budget and the Updated 2012 Long Range Plan.

99. On January 13, 2013, Defendants caused a memorandum they created at that time to be placed into the due diligence file for Baxano to review, explaining the results of the survey Defendant Reali conducted in July 2011 regarding surgeons' perceptions of the AxiaLIF product. The memo addressed the challenges the Company still faced regarding the tainted AxiaLIF product, notwithstanding that Defendants had been trying to address such challenges since 2010. Curiously, the memo concluded that surgeon's perceptions were "symptomatic of a technology that has not been aggressively sold or marketed since 2009 and the advent of the category III code. Much of what nonusers know has been painted by the competition and not TranS1. . . .

[AxiaLIF] is a technology that will take a **sustained and consistent sales and marketing effort for significant adoption**." (Emphasis added).

100.     On or about January 13-16, 2013, the Company held special meetings of the Board and a Transaction Committee appointed to discuss the status of the Baxano transaction including the results of the Company's due diligence, the offer term sheet, and a presentation on the value of the transaction by Stifel.  As a result, the Board authorized Defendants to proceed with full due diligence and the extension to Baxano of an offer term sheet that included a $15 million financing by Baxano stockholders simultaneous with the closing of the acquisition.  The Company and Baxano entered into the term sheet on January 17, 2013 and commenced full due diligence.

101.     During due diligence, Defendants learned that Baxano also had engaged in channel stuffing or "stocking order" sales transactions that inflated its fourth quarter 2012 revenues.  In a January 21, 2012 email, Defendant Slattery reported to Defendant Reali "I asked George [Harter] how January was going given the stocking orders.  He said that, although he was as nervous as I am, they are trending well in January so far, ahead of their plan." This was in addition to Defendants' prior knowledge – reflected in a November 7, 2012 email exchange between Defendants Slattery and Reali – that Baxano had repeatedly missed its own budgeted revenue targets as recently as during the third quarter of 2012.  As Defendant Slattery put it "[a]nother way to say it – they missed their September plan by 20%, they missed their October plan by 17%. . . ." Thus, Defendants knew or should have known that Baxano's fourth quarter 2012 channel stuffing transactions created the appearance that sales of Baxano's products and the resulting revenues were materially growing when in reality they were not.

102.     On January 19, 2013, the Board held another special meeting to discuss the Baxano transaction in which Stifel presented its valuation model of Baxano, the results of that

model (based on Defendants' future revenue projections), and its determination that the transaction would be accretive to the Company's shareholders.   Among other things, the terms and details of an offer and the proposed transaction were discussed.

103.   A February 3, 2013, email exchange between Defendants Reali and Slattery reflects that Defendants knew by that time that Baxano's value was reduced based on the fact that Baxano's management had lowered its own revenue projections for 2013.   Defendant Slattery also estimated that the combined company would have a $13-$14 million cash "hole," defined by Defendant Slattery as the "negative cash balance of newco [*i.e*, the combined Company] mid-2014."

104.   Among other things, the February 3, 2013, email exchange also reflects Defendant Slattery's view that:

> The value of their business (discounted cash flow) is much less than what we had before. . . . So, on a discounted cash flow basis, we are paying $30M for something that is worth $5.6M (or according to the football field negative $4.2M to $15.3M.).
>
> Now, that is not the only metric by which we evaluate the deal, but it is so far off that it demands special consideration. I'll come back to that.
>
> We also value this deal on the synergy that it generates. We've discussed this before - we shouldn't pay them up front (by giving them an extra helping of shares) for synergy when we are all shareholders of NewCo - they should earn their synergy on the same timetable we do.  In the last two models (Oct and January), we were effectively giving them very little synergy up front.
>
> The synergy of this deal does create value for our existing shareholders, but it gives a very high, disproportionate share of the overall synergy to their shareholders (because we are paying $30M for a business that is worth $5M). . . .
>
> Here is what I think we can/should say to the board:
>
> - Strategic rationale intact
> - Deal creates incremental value to existing TSON [Company] shareholders
> - ...In spite of the fact that the DCF for their standalone business is much lower than we are paying
> - ...Because we are creating so much value from the synergy

- ...And don't forget that we are financing this deal with TSON stock that is valued at a premium to its peers (always good to use stock as currently when it is overvalued on a relative basis)
- However, doing this deal creates a $10-$15M immediate cash need
  - Given the low DCF for their business versus what we are paying, we are increasing the risk that the share price could trade down after the deal
  - So, putting off a raise probably is a risk not worth taking
- FULL STOP. Before we go giving a recommendation that we talk to Delphi (and others), we test the committee's resolve given all these new facts (what we are paying is worth more to us than the DCF says). I think they will react one of two ways:
  - Tell us to call Baxano to renegotiate price
  - Tell us that they understand and want to know how we think we can fill the hole
- So, I don't think we should be presumptuous and jump straight to the recommendation to call Delphi.

105.    Importantly, the February 3, 2013 email further reflects Defendants' understanding of the impact of inflated revenue projections on the Company's future prospects, noting in the context of Defendant Reali's potential renegotiation talking points:

1. Your [Baxano's] 2013 revenue plan has changed materially since we last saw it. You took down your io-Tome plan by >20%. And it relies far too enthusiastically on io-Tome.
2. Your current expense forecast is too low. You are increasing revenue 100% and S&M is flat to last year. With 20% commission on 90% of your business, this is not logical.
3. Your current balance sheet forecast is unachievable. Your plan says that you'll grow sales by 100% while reducing your inventory by 50%, in the same year that you are launching a second product.
4. Our analysis of the product is that it is a very solid niche product, but it is not a $100M product, particularly not in five years as your plan suggests.
5. All these first four items roll into a long range outlook that is far less rosy than your long range plan
6. The cash raise needs of NewCo over the next two years are substantially higher than what we had anticipated because of the above changes to the model as well as the new expectation that the debt will have to be satisfied
7. So, the discounted cash flow value of your business went from $25-30M on our last analysis to at best $15M based on our calculations. The board is uncomfortable with this type of premium, particularly when the real value of this deal is in the synergy, in which you will share as NewCo shareholders. At $30M (the value we are paying in the term sheet), we are already giving you $25M in synergy up front, and that doesn't make sense.
8. [We can go from there, but to me the ask would be to pay $20M for their business, which is still giving them $15M in synergy value up front).

106.    On February 14, 2013, the Board held its regular meeting to review the Company's prior year fourth quarter financial results.   At the meeting, Defendant Slattery discussed that Company's $4.1 million revenue for the fourth quarter 2012 – that "included revenue of $1.0M for the initial shipment of AxiaLIF ll, 2L and facets to our new distributor in China, which was included in the revenue Forecast for December" – was in line with the Revised 2012 Budget Defendants had presented to the Board at the November 1, 2012 Board meeting, but was $1.3 million (24%) less than the $5.4 million in revenue that Defendants had projected for the fourth quarter 2012 in Defendants' original 2012 Budget.

107.    Defendant Slattery also reported that, on a consolidated basis, the Company earned only approximately $14.6 million in revenue or about $3 million (17%) less than the original $17.6 million estimated in Defendants' original 2012 Budget, reflecting a revenue decline of about $4.6 million (24%) less than the Company's 2011 revenue.

108.    But for the December China "channel stuffing" transaction, the Company's 4th quarter 2012 revenue would have missed the Revised 2012 Budget by approximately 25% and would have missed Defendants' original 2012 Budget by a massive $2.3 million or 43%.   It also would have caused material misses for Defendants' total revenue projections for 2012.   This further reflects the unreasonableness of Defendants' revenue and revenue growth forecasts in the 2012 Budget and Revised 2012 Budget at the time they were made, particularly since the reason for the reoccurring revenue misses were continuing declines in AxiaLIF product sales and the number of active AxiaLIF surgeons.

109.    Defendant Reali, during his report to the Board at the February 14 meeting regarding the value drivers for the Company, told the Board "[g]aining broad base payor coverage will come down to utilization of our category I code (i.e., the billing reimbursement

34

code).  The more surgeons we can get to perform AxiaLIF and work with our hot line to submit claims to private payors the greater chance we have of reversing current negative policies on AxiaLIF that were put in place with the t-code."  Thus, Defendant Reali recognized that the primary driver for Defendants' unreasonable projected future revenue and revenue growth estimates for the Company – which were incorporated into Defendants' Updated 2012 Long Range Plan and Pro Forma Projections for the combined company provided to the Board at the November 1, 2012 Board meeting – depended upon getting surgeons (who had abandoned AxiaLIF in droves, were still leaving, and had not returned) to use the AxiaLIF product they considered "tainted" and at the risk of not getting reimbursed for the surgery.  Moreover, as Defendants also knew, this herculean task of reversing the negative AxiaLIF sales trend would take a long time, would be more difficult without adequate sales resources and focus, and would be even more difficult if the merger with Baxano resulted in the loss of Baxano's sales force, as Defendant Slattery had predicted in his January 5, 2013 email if there was not enough cash and financing to run the combined Company.

110.    Despite all this knowledge, at the February 14, 2013 Board meeting Defendants did not revise their November 1 Revised 2012 Budget, their Updated 2012 Long Range Plan, or Pro Forma Projections for the combined company.  Defendants knew or should have known that the lack of any further changes to the already rosy forecasts reinforced the Board's unrealistic and unreasonable view of the Company's future prospects, all at a critical time when the Board needed to adequately consider all options and take appropriate action to protect the Company and its assets.  Instead, Defendant Reali, along with representatives of Stifel, reminded the Board regarding the strategic reasons for the Baxano transaction, updated the Board as to the status of negotiations and due diligence results, and discussed Stifel's valuation models, the contemporaneous Private Placement Transaction, and the Company's need for additional

financing. Not surprisingly under these circumstances, the misinformed Board took no action to stop the merger and right size the Company.

111.    On or about February 28, 2013, Defendants prepared a *pro forma*, condensed combined consolidated balance sheet and statement of operations for the year ended December 31, 2012 (i.e., as if the Company and Baxano previously had been merged). This provided a baseline of the combined company's 2012 revenue, cash burn and available cash, among other things. The statement of operations reflected that, after adjustments, the combined company had a total of just under $24 million in revenue in 2012, total operating expenses of about $65.6 million and a net loss of approximately $49.4 million.

112.    On March 1, 2013, the Company's Board held a special meeting to review the proposed Baxano transaction and Private Placement, among other things. At the meeting, Stifel indicated its intent to deliver its fairness opinion based on its prior report it had distributed to the Board at the special January 19, 2013 meeting. But once again, Defendants did not retract their overly optimistic projections of the Company's standalone future revenue and revenue growth in the 2013 Budget or the Updated 2012 Long Range Plan, all of which was incorporated in the Pro Forma Projections and Defendants' other *pro forma* revenue and revenue growth projections previously provided to the Board, that were inflated and lacked a reasonable basis as a result. Instead, Defendants continued to project an unreasonably positive future outlook for the post-merger combined company's future revenue and revenue growth, providing an unreasonably optimistic view of the Company's future prospects. As further alleged below, all of this same overly optimistic information was relied upon by Stifel in advising the Board regarding the transaction and in Stifel's fairness opinion on the transaction.

113.    Consequently, the Board did not have adequate information, but had misinformation, when it considered, discussed and resolved to allow Defendants to enter into the

merger, conduct the related Private Placement Transaction and issue a Proxy Statement to solicit the Company's shareholders to approval these transactions. Lacking such information, the Board accepted Defendants' recommendation that the Baxano transaction and Private Placement Transaction were advisable and in the best interests of the Company and its stockholders, when it was not. Thus, notwithstanding the Company's deteriorating financial condition and true diminished future prospects (which the Board was unaware of), the Board could not, did not and did not know that it needed to seriously and fully consider other alternatives to the high risk, overpriced, Baxano acquisition, such as a restructuring and right-sizing of the Company.

114.   Had Defendants (1) not included the inflated revenue and revenue growth forecasts in their 2013 Budget, Updated 2012 Long Range Plan, and Pro Forma Projections for the combined companies post-merger; (2) fully advised the Board on March 1, 2013 that the Company's revenues at the end of 2012 contained channel stuffing transactions that masked the Company's revenue misses compared to Defendants' original and Revised 2012 Budgets and that Baxano's revenues at the end of 2012 also contained channel stuffing transactions that created the appearance of revenue growth; and (3) properly adjusted their revenue and revenue growth projections for the Company and the combined company, the full Board would have had the missing and critical information it needed to properly determine that the Baxano merger was not in the best interests of the Company. Indeed, the full Board would have known that the combined company's post-merger future prospects were much dimmer, given the combined company's even higher cash burn rates, overstated revenue prospects, and lack of an adequate long term capitalization plan.

115.   Thus, the Board was prevented from adequately considering, and did not adequately consider, reasonable alternative options to the Baxano acquisition, such as right-sizing the Company.

116.    On March 3, 2013, Baxano and the Company executed the Merger Agreement and related agreements and the Company and investors executed the Securities Purchase Agreement.  A joint press release announcing the Merger and the Private Placement Transaction was issued on March 4, 2013.

117.    On March 6, 2013, the Company filed with the SEC its audited financial statements for the year ending December 31, 2012.  In connection with its audit report, PWC stated its opinion of substantial doubt that the Company could continue as a going concern in 2013.

118.    On May 2, 2013, the Board held its regular meeting to review the Company's first quarter 2013 financial results.  At the meeting, Defendant Slattery explained that "current year-to-date revenue was $3.1M, which was unfavorable to Plan by $1.3M, or 29.5%, as our AxiaLIF surgeon base had a slight decline over Q4 but the predominant miss was due to lower case volume. . . . Revenue versus the prior year also showed decreases in AxiaLIF products. . . ." Defendant Reali noted that the Company's "Q1 core TranS1 sales (AxiaIF and VEO) were below expectations as we struggled with case volume overall from our current customer base." Reali also noted that one of the Company's impediments to getting more private payers to approve reimbursement for AxiaLIF products was partially due to "current negative views on AxialiF such as the Hayes report which still has a neutral to less than positive view on AxialiF. This report has definitely hurt us with some payers."

119.    Once again however, Defendants did not reveal to the Board that their revenue projections in the 2013 Budget were unreasonable, did not revise their Updated 2012 Long Range Plan, and did not reveal that their Pro Formal Projections for the combined company provided to the Board at the November 1, 2012 Board meeting were unrealistic and unreasonable.  This was right at a critical time when the Board needed to adequately consider all

options and take appropriate action to protect the Company and its assets – which the Board did not do and did not appreciate the urgent need to do. Instead, the Board allowed Defendants to continue down the path of the Baxano acquisition and represent in the upcoming Proxy that the Board recommended that the Company's shareholders vote to approve the Baxano acquisition and related financing.

120.   On May 9, 2013, Defendants announced the Company's first quarter 2013 financial results and issued guidance for the second quarter and year-end 2013, stating that the Company had achieved just $3.0 million in revenues for the quarter ended March 31, 2013 and that:

> for the second quarter ending June 30, 2013, the Company expects total revenues in the range of $4.0 - $4.5 million, which assumes closing of the Baxano merger on May 31, 2013. On a pro forma basis, including Baxano's revenue through May 31, 2013, the Company expects total revenues in the range of $5.6 - $6.3 million. For the full fiscal year 2013, on a pro forma basis for the combined companies, the Company now expects total revenues in the range of $25 - $29 million versus prior guidance of $28 - $32 million.

121.   Defendants simultaneously filed the Proxy with the SEC on Form DEFM -14A on May 9, 2013. The purpose of the Proxy was, among other things, to solicit shareholder approval for the Baxano transaction and accompanying Private Placement transaction.

122.   The Proxy, signed by Defendant Reali on behalf of the Board, included *pro forma* information (reflected in the chart below) regarding the combined Company's estimated 2013 revenue and future revenue projections for 2014-2017. Notably, while the 2013 estimated revenue was relatively conservative it was still higher than Defendants' guidance issued the same day on Form 8-K.

123.   The Proxy's 2013-2017 *pro forma* projections of increased revenue levels and inherent revenue growth rates in each year 2014- 2017 were without a reasonable basis. For example, they reflected $32.2 million additional revenue (an astronomical growth rate of 96.4%)

in 2014, $38.7 million additional revenue (growth rate of 59%) in 2015, $52.7 million additional revenue (growth rate of about 51%) in 2016, and $67.9 million additional revenue (growth rate of 43%) in 2017:

|  | 2013E | 2014P | 2015P | 2016P | 2017P |
|---|---|---|---|---|---|
| Revenue (in millions) | $33.4 | $65.6 | $104.3 | $157.0 | $224.9 |
| Net income/(loss) (in millions) | ($28.0) | ($18.4) | $7.9 | $35.4 | $61.4 |

124.    However, based on Defendants' knowledge at the time, these revenue and revenue growth projections, particularly in 2014, were not achievable and lacked a reasonable basis, particularly since Defendants already had lowered their second quarter and year-end 2013 guidance the same day.

125.    Defendants also knew that both the Company and Baxano had engaged in channel stuffing types of sales transaction to meet short term revenue targets – an act that would deplete future sales revenue by pulling it into the current period in which the sale was consummated and recognized – and intended to keep on doing it. For example a May 6, 2013 email exchange between Defendant Reali and another Company executive reflects Defendant Reali asking "the probability of getting a Mexican stocking order this quarter and how much" in connection with Reali's ongoing efforts to complete the Q2 2013 revenue forecast. The executive's response reflects the channel stuffing nature of the sale: "The stocking order is currently for $177,000. I am negotiating VEO prices which could potentially reduce VEO order by $25,000. I'm driving for $1875 per cage, but they are saying they will not be able to drive volume at that level."

126.    Defendants also knew at the time that both Baxano's and their own budgeting and revenue forecasting activities were not accurate or reasonably achievable given that the Company and Baxano repeatedly had materially missed their respective budgets and revenue projections.

127.   And, perhaps most importantly, Defendants also knew or should have known at the time that the combined Company's future revenue forecasts lacked a reasonable basis and presented a more favorable view of the combined Company's prospects than Defendants knew could be achieved.  For example, a May 25, 2013 email from Defendant Slattery to Defendant Reali regarding projected expenses, cash burn and financing needs of the combined Company for purposes of closing a $10 million "hole" as of June 30, 2014, suggests that if they can narrow that hole to "within $2M, we plug it to synergy and make it happen."

128.   As the Proxy itself reflected in connection with the Company's stand-alone revenue projections, which were incorporated into the combined company's *pro forma* projections, "Total Revenue for 2013 assumes growth over the prior year as a result of increased sales of its AxiaLIF products, due primarily to the establishment of a Category I code providing broader reimbursement," "Total Revenue for 2014 assumes continuing growth as a result of increased sales of its AxiaLIF products, due primarily to the broader private reimbursement coverage," and "The Company's projected Total Revenue for the periods 2015-2017 assumes broad reimbursement for the AxiaLIF products."  Based on Defendants' knowledge at the time, however, these assumptions lacked any reasonable basis, but Defendants never disclosed that to the Company's Board, to Stifel, or to the Company's shareholders in the Proxy.

129.   As the Proxy Statement further disclosed, Stifel relied on Defendants' various revenue and revenue growth projections in advising the Company's Board regarding the transaction including with respect to its fairness opinion:

> On March 1, 2013, Stifel delivered its written opinion, dated March 1, 2013, to the Company's Board of Directors that, as of the date of the opinion and subject to and based on the assumptions made, procedures followed, matters considered, limitations of the review undertaken, and qualifications contained in such opinion, the aggregate consideration to be paid by the Company in the Merger pursuant to the Merger Agreement is fair to the Company, from a financial point of view.

With respect to estimates, forecasts or projections of the Company's or Baxano's future financial performance prepared by or reviewed with the Company's management (including, without limitation, the Target Projections, the Expected Synergies, and estimates and projections relating to possible future debt or equity financings by the Company on both a standalone basis and on a pro forma combined basis assuming acquisition of Baxano, in each case for the periods reviewed for Stifel's discounted cash flow analysis) or obtained from public sources, Stifel relied upon the statements of the Company's management that such estimates, forecasts, and projections (and the assumptions and bases therein) are reasonable and achievable and, with the consent of the Company's management, assumed that such estimates, forecasts, and projections represent the best available estimates, forecasts, and projections and have been prepared in good faith on assumptions which, in light of the circumstances under which they were made, are reasonable, as has been represented and warranted by the Company or, with respect to estimates, forecasts and projections obtained from public sources, represent reasonable estimates, forecasts and projections and that such estimates, forecasts and projections provided a reasonable basis upon which Stifel could form its opinion.

130.    In determining to recommend the transaction to the Company's shareholders and resolving to allow Defendants to close the transaction subject to shareholder approval, the Company's Board clearly relied on Defendants' *pro forma* revenue projections, as well as Stifel's fairness opinion that itself relied on Defendants' revenue projections. As the Proxy Statement provided in relevant part:

Reasons for the Merger

*Our Reasons for the Merger*

Our Board of Directors believes that the Merger will provide substantial benefits to our business and operations. In reaching its determination to approve the Merger Agreement and the transactions contemplated thereby, and to recommend that our stockholders approve the proposal regarding the issuance of shares of our common stock pursuant to the Merger Agreement, our Board of Directors identified several potential benefits for our company and for our stockholders, including:

- the potential for significant revenue growth from Baxano's MIS spine platform including the proprietary iOFlex Decompression device and the iOTome facet removal systems; . . . and

- the potential to improve our financial profile by improving our margins and shortening the expected timeline to achieve breakeven cash flow.

With respect to the last bullet above, we considered two margins in determining that acquiring Baxano may improve our margins and shorten the expected timeline to achieve breakeven cash flow: contribution margin (after selling expenses) and operating margin (after all operating expenses). We expect contribution margin to improve due to the overall increase in scale of the combined business, resulting in a lower impact of fixed costs on contribution margin, as well as the ability to eliminate duplicative costs, such as personnel, travel, sales meetings, trade shows, and consultants. Our operating margin is likewise expected to improve due to the overall increase in scale of the combined business, not only driven by an increase in contribution margin, but also through the ability to eliminate duplicative general and administrative expenses and research and development costs. This improvement in operating margin is the primary contributing factor to our belief that we will be able to achieve breakeven cash flow earlier as a combined business than on a standalone basis. [In an April 4, 2013 letter, the SEC required Defendants provide this explanation upon its review of a prior draft of the Proxy Statement].

Our Board of Directors consulted with our management, as well Stifel and legal counsel, in reaching its decision to approve the Merger Agreement and the transactions contemplated thereby. The factors that our Board of Directors considered include:

- the potential benefits described above;

- historical information concerning Baxano's business, financial performance, financial condition, operations, and management and the potential for significant revenue growth and gross margin improvement of the combined company, particularly given the cost synergies expected to be achieved through the Merger, the successful commercialization of Baxano's products, and the companies' complementary customer bases;

- our management's view of the complementary nature and fit of Baxano's business with ours and its current business prospects;

- our management's view of the financial condition, results of operations, and business of Baxano and us before and after giving effect to the Merger and information regarding the Merger's potential effect on our stockholder value;

- reports from our management and legal and financial advisors regarding the results of the due diligence investigation of Baxano;

- the opinion of Stifel as to the fairness to the Company, from a financial point of view, of the Merger. . . .

131.    Relying on the recommendation of the Board, the revenue projections and Stifel's fairness opinion, as all set forth in the Proxy Statement, the Company's shareholders voted to approve the Baxano acquisition and the Private Placement transaction.

132.    On or about May 31, 2013, the transaction closed and Baxano was merged into the Company.  Thus, as a direct result of Defendants' misinformation, the Company entered into the Baxano merger.  Had the Board (or the Company's stockholders for that matter) been properly informed, the Board could have undertaken measures to terminate further consideration of the Baxano acquisition and, instead, right size the Company.

133.    As alleged above, this right sizing easily could have been achieved by the Board to preserve a large portion of the Company's assets, cash flow and market capitalization.  The Board did not do so because it relied on Defendants' inflated future revenue and revenue growth projections that lacked a reasonable basis.

134.    Defendants' improper actions alleged herein were significantly motivated by their self-interests, including those related to their compensation.  Notwithstanding the Company's deteriorating condition and true diminished prospects, Defendants' compensation for 2013 increased.  For example, Defendant Reali's base compensation increased from $370,000 in 2012 to $400,000 in 2013.  Defendant Slattery's 2013 base compensation also increased significantly from the 2012 level of $298,443.

**F.     Defendants Engage in a Wasteful Relocation Process that Serves Only Their Self-Interest**

135.    Consistent with prior actual revenue trajectories for Baxano and the Company before the merger, and contrary to Defendants' future revenue projections, the newly combined Company's revenues continued to decline after the merger.  The Company also incurred a number of additional expenses due to the merger and, during the integration process, lost a

number of sales personnel, all as Defendant Slattery had previously predicted. As a result, the combined Company's rate of cash burn was even higher and its future revenue prospects grew even dimmer. Defendants, at this point, had no reasonable basis to believe that the Company would be able to achieve a favorable capitalization plan that would allow the Company to raise adequate long-term cash without resorting to a lender that would fully encumber the Company's assets.

136.    On June 28, 2013, the Company announced that it had entered into a settlement agreement with the Department of Justice resolving the OIG investigation and the *qui tam* complaint for approximately $6 million (payed out over time in quarterly installments).

137.    Notwithstanding Defendants' knowledge of the Company's continual declining revenue, increased rate of cash burn, additional integration expenses, loss of sales personnel, unreasonableness of their future revenue and revenue growth projections, and lack of adequate capitalization or an adequate long term capitalization plan, Defendant Reali forged ahead with his unnecessary and expensive relocation of the Company's former Wilmington, North Carolina, headquarters and operating facilities to Raleigh, breaching his duty of care and wasting the Company's assets. The corporate relocation was distracting to the integration effort and very expensive.

138.    The relocation process was begun on October 24, 2012 when Defendant Reali caused the Company to lease approximately 4,300 square feet of executive office space in Raleigh to commence March 1, 2013. The initial lease cost the Company over $170,000 between July 2013 and November 2014. On June 30, 2013, Defendant Reali caused the Company to triple its leased executive office space in Raleigh from just the 4,300 square feet initially leased in October 2012 to a total of about 12,900 square feet. This increase resulted in an additional cost to the Company of over $225,000 between July 2013 and November 2014.

139.    At the same time, the lease on the Company's Wilmington facility was not due to expire until December 7, 2014 and the lease on the former Baxano facilities in San Jose, California was not due to expire until December 9, 2014.  The Wilmington lease ran about $21,300 per month while the San Jose lease cost another $30,200 per month.  Thus, as a result of the Raleigh relocation, the Company had to bear the cost of simultaneously maintaining *three* major leases.  The Company also had to incur many other duplicative costs related to simultaneous operations at three facilities, such as insurance, maintenance and communications systems.

140.    In addition, the relocation required the Company to pay hundreds of thousands of dollars in either severance or relocation expenses to certain Company employees.  Defendant Reali also authorized the expenditure of scarce Company funds to pay for new furniture at the Raleigh facility and renovation expenses at the Raleigh facility.

141.    This forced relocation was driven by Defendant Reali's self-interest because he and Defendant Slattery, who both lived in Raleigh, were two hours (approximately 134 miles) from the Company's then-existing Wilmington facility.  While Defendants previously had leased some small lab and executive space in Raleigh for training surgeons, Defendant Reali determined to move the Company's entire operations to Raleigh because he had been commuting from Raleigh to Wilmington for several years, a trip that took roughly two hours each way.

**G.    The Company Fails to Meet Defendants' Inflated Projections**

142.    On August 7, 2013, the Company's Board held its regular meeting to discuss the Company's financial results through the second quarter of 2013, among other matters.  At the meeting, Defendant Slattery disclosed that the Company's second quarter 2013 revenue (which did not include any Baxano revenue) was only $5.7 million.   Slattery explained that the revenue miss was "due to: lower AxiaLIF cases than estimated."  He also disclosed that the Company's

net loss for the quarter was "6% worse than plan, in dollars equal to the gross profit miss on lower revenue" and that the Company had once again lost active surgeon customers for the AxiaLIF product, a continuation of the downward trend that had begun in 2009 and had not been reversed despite Defendants' heavy emphasis on, and expenditures to increase, its sales force. As of the second quarter 2013, the Company's base of just 55 active surgeons that would use the product was at an all-time low since 2009.

143.    On August 8, 2013, Defendants announced the Company's (stand-alone) financial results for the second quarter 2013 (i.e., prior to the Baxano transaction), including that it had achieved just $3.9 million in revenue.  More importantly, however, Defendants revealed that they were lowering their revenue guidance for the third quarter ending September 30 and year ending December 31, 2013. "[T]he Company expects total revenues in the range of $5.6 - $6.2 million. For the full fiscal year 2013, on a pro forma basis for the combined companies, the Company now expects total revenues in the range of $23.5 - $25.5 million."

144.    This was plainly inconsistent with Defendants' prior revenue projections to the Board that the combined Company would have *pro forma* revenue of $33.4 for 2013.  The new guidance reflected an incredible 30% decline from the 2013 revenue projection in the Proxy made just three months earlier – a difference that would tremendously impact the Company's cash burn, lack of available cash and decrease the time the Company would have to a cash "dry well."

145.    No doubt seeing the proverbial writing on the wall, indeed the wall about to crumble, Defendant Slattery resigned from the Company on or about September 27, 2013, receiving a large severance payment in the process through his pre-existing severance agreement.

**H.    Defendant Reali Presents Another Unreasonable Revenue and Revenue Growth Forecast to the Board in Order to Take on an Onerous Debt Obligation Secured Against All of the Company's Assets**

146.    On October 16, 2013, Defendant Reali executed a term sheet with Hercules Technology Growth Capital ("Hercules") to obtain up to a total of $15 million in desperately needed cash to fund operations and pay off the Company's existing unsecured term loan (acquired in connection with the Baxano acquisition) of approximately $3 million.  As initially proposed, the Company could draw down the credit facility in three equal $5 million tranches, with the second and third tranche each subject to the Company's ability to hit certain revenue targets.  The credit facility had a floating interest rate initially set at 12.5%, was payable monthly and had an initial nine month interest only period.  It was to be secured by a perfected first lien position on all of the Company's assets, including its intellectual property. While entry into the Hercules credit facility carried with it a $25,000 commitment charge, more importantly it committed the Company to payment of a $127,500 "facility charge" (i.e., break-up fee) should Baxano determine not go through with the credit facility.

147.    Defendant Reali was plainly driven to execute the Hercules term sheet by his self-interest relating to his compensation and continued employment with the Company.  Indeed, in connection with the approval for the Baxano transaction, the Board also approved on May 2, 2013, a 2013 Cash Bonus Plan for, among others, Defendant Reali (for up to 50% of his base salary).  Determination of Defendant Reali's cash bonuses paid under the 2013 Cash Bonus Plan had three components: a variable revenue target component (worth 50% of the bonus), an available cash component (25%, but only if the minimum cash level was met) and a variable individual performance target component (25%).  The available cash component represented a $50,000 Cash Bonus payment to Defendant Reali for 2013 if it was achieved.

148.    By mid-October Defendant Reali knew that if the Board determined to reorganize or right-size the Company and not accept the Hercules credit facility or the Lincoln Park Capital ("Lincoln Park") equity line that he was about to propose to them (*see* next paragraph), the Company might not hit the $4.2 million available cash target under the 2013 Cash Bonus Plan. Defendant Reali knew this because, as of month end September 2013, the Company had a $2.4 million rate of monthly cash burn, $11.6 million available cash, and had incurred a nearly $1 million increase in accounts payable over the accounts payable balance as of August 31, 2013.

149.    The Audit Committee of the Company's Board met on October 29, 2013.  Among other things, Defendant Reali discussed with the Committee the need for the Hercules credit facility, as well as the line of equity financing with Lincoln Park.  Under the equity line, the Company would have the right to sell to Lincoln Park up to a total of $7.0 million in shares of common stock, subject to certain limitations, as often as every other business day over the 36 month term of the Purchase Agreement, at the Company's sole discretion.

150.    On October 30, 2013, the Board held its regular meeting to discuss the Company's third quarter 2013 financial results.  The Company's new Chief Financial Officer reported the Company's total revenue of about $5.3 million for the third quarter, noting that it "was essentially flat versus Q2 (*pro forma*) but behind plan by 7.9%."  The CFO also reported that "Cash at 9/30/13 of $11.6M is behind plan by $1.1M."  As reflected in the *pro forma* consolidated balance sheet, the Company's quarterly cash burn rate as of the third quarter of 2013 was approximately $7.2 million per quarter (net of approximately $530 thousand in merger and integration expenses).  Given the remaining available cash of $11.6 million, the Company would be out of cash before the end of the first quarter of 2014.

151.    Notably, the financial presentation to the Board revealed that the U.S. portion of the Company's *pro forma* revenue was lower than plan by 11.2%, reflecting a 3.2% decline from

the prior quarter on a *pro forma* basis.  In addition, a comparison of U.S. revenue by product revealed that revenue from Baxano's key iO-Flex and iO-Tome products had declined by approximately $167 thousand, $445 thousand and $420 thousand, in the first, second and third quarters of 2013, respectively, as compared to the fourth quarter of 2012 (the quarter in which Baxano engaged in channel stuffing "stocking" transactions).  Similarly, the comparison of U.S. revenue by product revealed that revenue from the Company's key AxiaLIF and VEO products had declined by approximately $245 thousand, $31 thousand and $305 thousand, in the first, second and third quarters of 2013, respectively, as compared to the fourth quarter of 2012 (the quarter in which the channel stuffing China "stocking" transaction was booked).

152.    Among other things, Defendant Reali represented to the Board at the October 30 meeting that "[t]he steps taken this quarter have put the company in a position for success in the near term quarters. . . . Our four products all have the capability to grow with solid sales force execution."

153.    Reali confirmed in his report that "the greatest risk continues to be AxiaLIF driven by lack of broad private payor reimbursement for the category I code...."  While Reali still presented a positive view "that the levers we are pushing on will lead to eventual success [regarding reimbursement strategy]," he acknowledged that "the timing is hard to fully determine." And, as previously had been a concern to Defendants following the 2011 surgeon survey, Reali's report to the board confirmed that the road would be long to removing surgeons' view that AxiaLIF was a tainted product. As Reali explained:

> We have had some fairly negative data published on AxiaLIF from a surgeon at Cornel (Dr. Hartl). This data from cases performed in 2008-2009 focused on negative results on the 2 level procedure. It did have an overall neutral to positive review on the AxiaLIF one level but niched the technology into a very limited indication. This paper brings about an important issue where all of the current data on AxiaLIF is based on the old two level and one level technology. We have

a concerted effort to drive clinical papers with the new 1l+ and 2L+ technology over the next couple of years.

All of this further demonstrates the unreasonableness of Defendants' future revenue projections for the Company made to the Board at critical times.

154.   In addition, Defendant Reali's Board presentation identified a number of "weaknesses" in the Company's then-current position as including "Past Outcomes of AxiaLIX," "Lack of significant private payor coverage for AxiaLIF," "Cash Needs Could Limit More Aggressive Investment," and "Current Sales Team has not yet Executed."  More importantly, Defendant Reali identified the "threats" facing the Company as including "Scrutiny on Medical Necessity of Spinal Fusions," and "Negative View of Spine by Investment Community."

155.   Notwithstanding these hurdles, and with reckless indifference to them, Defendant Reali continued to tout the market opportunities for the Company, project positive future growth prospects for AxiaLIF revenue and estimate future profitability at unreasonably high levels (but now pushed off these projections in his presentation to the Board as part of a five-year "goal" for "Q3 2016 through Revenue Growth and Disciplined Investment in R&D and Capital Expense while increasing gross margins. . . ."). In particular, Defendant Reali projected in his Board presentation the following future "Downside Case Revenue and Profits" of: $24.16 million revenue and a $38.48 million loss for 2013; $33.03 million revenue and a $20.74 million loss for 2014; $44.00 million revenue and a $4.77 million loss for 2015; $60.01 million revenue and a $7.43 million profit for 2016; $78.05 million revenue and a $19.99 million profit for 2017; and $100.02 million revenue and a $28.40 million profit for 2018.  Reali's "Base Case Revenue and Profits" and "Robust Case Revenue and Profits" were even more unreasonable.

156.   While Defendant Reali's "Downside Case Revenue and Profits" projection was substantially reduced from what Defendants had previously represented to the Board, the

Board's advisor (Stifel), and the Company's stockholders in the Proxy less than six-months earlier, Defendant Reali did not inform the Board at the October 30 meeting that even his reduced "Downside Case Revenue and Profits" projection had no reasonable basis, given his knowledge about the Company's financial difficulties and continually declining AxiaLIF revenue, and therefore should not be relied upon by the Board.

157.   In connection with the Financing Update and Discussion on Next Steps for the Board at the October 30 meeting, Defendant Reali also reviewed the status of the Hercules credit facility and next steps relating to its completion.  In addition, Defendant Reali also reviewed the benefits associated with the Lincoln Park equity financing arrangement.

158.   Given the Company's further deteriorated financial condition and lack of cash to get through the first quarter of 2014, Defendant Reali knew or should have known that his revenue projections continued to give the Board an unrealistic and unreasonable view of the Company's future prospects, all at an even more critical time when the Board immediately needed to fully evaluate every possible option to take appropriate action to protect the Company and its assets, including an immediate and complete reorganization and downsizing of the entire operation.

159.   Consequently, the Board did not have adequate information, but had misinformation, when it considered and decided to allow Defendant Reali to move forward with the credit facility and the equity line of financing with Lincoln Park.  Notably, at that point the Company was already committed to paying the $127,500 break-up fee should the Board decide not to let Defendant Reali go forward with the credit facility, a factor that the Board could not adequately weigh given its misperception of the Company's future revenue and earnings prospects due to Defendant Reali's unreasonable future revenue and revenue growth projections.

160.    Thus, notwithstanding the Company's dim future prospects (which the Board was unaware of), the Board could not, did not and did not know that it needed to take appropriate action to protect the Company and its assets, including an immediate and complete reorganization and downsizing of the entire operation.  But for Defendant Reali's breach of his duties of loyalty and care, the Board could have made the appropriate, fully informed decision, at that time to reorganize and downsize the Company to eliminate cash burn, preserve cash and save some of the value of the Company's assets and shareholder value, despite the $127,500 cost of the Hercules break-up fee that Defendant Reali had committed the Company to by signing the Hercules term sheet.  Indeed, had Defendant Reali informed the other Board members of the unreasonableness of his revenue and revenue growth projections for the Company and of the Company's diminished future prospects, the other Board members would have known that they would breach their own fiduciary duties to the Company if they did not consider immediately reorganizing and right-sizing the Company to reasonably achievable revenue levels and forego further funding from the Hercules credit facility that could not be repaid and from private investors that would only be quickly consumed by the Company's excessive rate of cash burn.

161.    On November 19, 2013, the Finance Committee of the Board met to discuss the status of the secured debt financing credit facility with Hercules and the equity line of financing with Lincoln Park.  By that time, Defendant Reali knew from a consolidated statement of operations (created on November 14, 2013) as of month-end October 2013, that the Company's revenue to date for the fourth quarter of 2013 was 20% less than plan and that the net loss for the quarter to date was nearly 30% more than plan.  The Company's monthly cash burn had increased to just over $3 million, or about $720 thousand more than planned.

162.    In addition, Defendant Reali also knew from the October 2013 consolidated balance sheet (that was part of the October 2013 financial statement), that the Company's

available cash as of October 2013 was only about $7.5 million, approximately $1.6 million (over 18%) less than expected.  Thus, at the $2.4 million September, or $3 million October, monthly rates of cash burn, the Company likely would finish the year with available cash of just $1.5 million, well less than the $4.2 million minimum level needed for Defendant Reali to earn his 2013 Cash Bonus, let alone not enough to carry the Company for even the first month of January 2014.

163.    To better manage cash to achieve the $4.2 million minimum target under the 2013 Cash Bonus Plan, Defendant Reali caused the Company to delay payments to the Company's vendors in November and December.  For example, the Company's $9.8 million in total current liabilities as of November 30, 2013 increased by nearly $680 thousand from total current liabilities of about $9.1 million as of October 31, 2013.  And, from month end November 2013 to month end December 2013, the Company's accounts payable increased by approximately $1.3 million. In addition, the number of days outstanding on the Company's accounts payable increased substantially over this period.

164.    On December 3, 2013, the Company entered into the Hercules credit facility, which had been revised to permit an initial draw of $7.5 million in the first tranche, $2.5 million in the second tranche (conditioned upon achieving $6.0 million in gross commercial revenue for the fourth quarter of 2013) and $5.0 million for the third tranche (conditioned upon achieving $7.0 million in gross commercial revenue for the first quarter of our 2014 and net proceeds of at least $15.0 million from sales of equity securities on or before June 15, 2014).  That same day, the Company also entered into the equity line Purchase Agreement with Lincoln Park.

165.    During December, Defendant Reali caused the Company to draw down $7.5 million from the Hercules credit facility, sell approximately $600 thousand worth of stock to Lincoln Park, and repay the approximately $3 million outstanding term loan.  But for this

funding, and Defendant Reali's actions – particularly including delaying vendor payments (and $1.3 million increase in accounts payable) – the Company would not have achieved the minimum $4.2 million cash target under the 2013 Cash Bonus Plan. Thus, Defendant Reali would not have earned a corresponding $50 thousand cash bonus payment thereunder, along with a substantial portion of his personal achievement component worth another $30,000.

166.   In addition to his $400,000 annual salary for 2013 and $80,000 in 2013 Cash Bonus Plan payment, Defendant Reali also was awarded a total of $355,145 in stock options (an expense to the Company), for total 2013 Compensation of $835,145. As previously alleged, Defendant Slattery received a material increase in his 2013 base compensation over the level of his 2012 base compensation.

## I.    Continuing to Experience Declining Revenues and Lacking Adequate Capitalization, the Company is Forced to File for Bankruptcy and Sell its Assets to Repay its Secured Lender

167.   During January and February 2014, Defendant Reali and the Board held a series of meetings to discuss, among other things, the Company's urgent need for additional operating capital and the various options to obtain it. For example, on January 26, 2013, the Board met to discuss the Company's deteriorated cash position, types of available financing through an investment banker presentation, and the selection and retention of a lead investment banker structure.

168.   On February 6, 2014, the Board held its regular meeting to discuss the Company's fourth quarter and year-end 2013 financial results, as well as the budget for 2014. At the meeting, the Company's CFO reported that total year 2013 *pro forma* revenue for the combined Company was about $23.3 million, reflecting a decline from the total year 2012 *pro forma* revenue for the Company (i.e., had it been combined in 2012) of $24 million. The CFO also reported that fourth quarter 2013 revenue was $5.955 million. In addition, the CFO reported that

the Company had a total of about $9.1 million in available and restricted cash on a consolidated

basis at year-end 2013, or only about $4.7 million net of the funding obtained from Hercules and

Lincoln Park in December.

169.    The $5.955 quarterly revenue amount was less than the minimum $6 million

revenue threshold set by Hercules for the Company to draw the second tranche under the secured

credit facility without a waiver of that condition by Hercules. And, although the Company had a

total of about $9.1 million in available and restricted cash on a consolidated basis at year-end,

this reflected an enormous *79% decrease in the $40.8 million amount of such cash that*

*Defendants had projected in the May 2013 Proxy only 9 months earlier*.

170.    A December 2013 Financial Statement provided to the Board further reflected

that the Company's quarterly rate of cash burn had increased in the fourth quarter of 2013 to

approximately $8 million, primarily as a result of further declining revenue and increased

expenses, including those relating to the OIG settlement.  At the then-present revenue, expense

and available cash levels, the Company only had enough cash to survive through the first quarter

of 2014 unless the Company could raise more money by selling stock and convince Hercules to

permit a second draw.

171.    During the February 6, 2014 meeting, Defendant Reali's budget for 2014 was

presented to the Board (the "2014 Budget").  Notwithstanding the Company's repeated failures

to achieve Defendants' revenue and revenue growth projections in prior budgets, and the

continuing declining revenues particularly including through the fourth quarter of 2013,

Defendant Reali's 2014 Budget again unreasonably projected first quarter 2014 revenue of about

$6.1 million, second quarter revenue of $7.1 million, third quarter revenue of $8.4 million and

total 2014 revenue of about $31.4 million (i.e., a total 2014 revenue growth rate of 34% over

2013 revenue levels).  While this was less absurd than Defendants' projected future revenue

growth rates in the previous 2012 and 2013 Budgets, undated budgets, 2012 Long Range Plan and Updated 2012 Long Range Plan, *it still lacked a reasonable basis* given the Company's historical experience and then-existing circumstances, including the difficulties with its sales force following the integration of Baxano, continuing decline in AxiaLIF revenue, and long time frame required to turn sales around given surgeons' views regarding the AxiaLIF product as "tainted."

172.    As before, Defendant Reali did not advise the Board at the February 6 meeting that the revenue projections contained in the 2014 Budget lacked a reasonable basis.  Without the correct revenue projection or knowledge that the revenue forecast lacked a reasonable basis, the Board did not take appropriate action to protect the Company and its assets, including an immediate and complete reorganization and downsizing of the entire operation.  Instead, the Board determined to continue looking for additional financing options.  Under the existing circumstances of the Company's dire cash situation, declining revenues, increased rate of cash burn, loss of surgeon customer base, lack of a viable or adequate capitalization plan, the Board needed to know that there was no reasonable basis to Defendant Reali's continuing inflated, albeit reduced, future revenue and revenue growth forecast in order to fulfill the Board's own fiduciary duties to the Company by not permitting Defendant Reali to continue pursuing cash through any means necessary, particularly including the sale of the Company's securities based on unreasonable and unachievable revenue projections which could have exposed the Company and the Board members themselves to liability for securities fraud.

173.    On February 12, 2014, the Board met, discussed and approved the resolutions for the Company to enter into a securities purchase agreement with two institutional investors, Sabby Capital and DAFNA, to purchase up to an aggregate of $10.0 million of subordinated convertible debentures (subordinated to the Hercules credit facility), along with 100 warrant

coverage to purchase shares of common stock in a private placement transaction, all if approved by the Company's shareholders at the upcoming 2014 annual meeting.  On February 19 and 28, 2014, the Board met again by phone conferences to discuss the status of an alternative revised financing structure and decided to proceed forward with such option if necessary.

174.    On March 3, 2014, the Company publicly filed its financial statements with the SEC for the year ending December 31, 2013.  PWC's Report on its audit of those financial statements included PWC's statement of "substantial doubt about [the Company's] ability to continue as a going concern" through 2013.

175.    On March 10, 2014, the Board met and approved the resolutions enabling the Company to enter into the securities purchase agreement with Sabby Capital and DAFNA.  As before, Defendant Reali still did not advise the Board that his 2014 budget and future revenue projections lacked a reasonable basis during any of the Company's full Board or committee meetings held from January 26 through March 10.  Had he done so, the other Board members would have known that they would breach their own fiduciary duties to the Company if they did not adequately consider an immediate reorganization and right-sizing the Company to reasonably achievable revenue levels and forego further funding from private investors that would only be quickly consumed by the Company's excessive rate of cash burn.  As a result, the Board did not take appropriate action to protect the Company and its assets, and instead, exposed the Company to a potential securities fraud claim.

176.    On March 11, 2014, the Company entered into the securities purchase agreement with Sabby Capital and DAFNA. Among other things, Defendant Reali immediately authorized payments to himself and other Company executives under the 2013 Cash Bonus Plan from the cash they had received from the securities purchase agreement.

177.    As of March 31, 2014, the Company's first quarter 2014 revenue totaled just $4.4 million, nearly $1.7 million less (28%) than Defendant Reali presented to the Board on February 6 in his 2014 Budget and approximately 26% less than the revenue the Company had achieved during the fourth quarter of 2013.   Moreover, as of the end of the first quarter 2014, the Company had burned through $8.7 million in cash, a quarterly cash burn that was even higher than the fourth quarter of 2013.

178.    Incredibly, on April 11, 2014, Defendant Reali caused the Company to enter into a further expansion of the leased facilities in Raleigh, increasing the then existing 12,862 square feet of space by an additional 6,329 square feet at annualized cost of over $127,500 payable in the amount of about $10,600 per month.

179.    Due to the dire first quarter 2014 results, the Board met on April 14, 2014, to review a revised 2014 budget for the Company (the "Revised 2014 Budget"), as well as to discuss any possible available financing options given that the Company would be out of cash in just five months.   A presentation regarding the Revised 2014 Budget revealed much lower projected total revenues for 2014 of just $25.4 million, compared to the $31.4 million that Defendant Reali had presented to the Board only two months prior on February 6.   Among other things, the Revised 2014 Budget presentation noted that the new, greatly reduced, revenue projection for 2014 was "Deliberately conservative to align with spending," revealing that Defendant had, and still was, basing revenue projections on whatever picture he wanted to present to the Board, not on the realities of the Company's situation of no growth at all or negative growth.   Thus, under no circumstances was it reasonable to conservatively align revenue with spending, but rather spending should have been conservatively aligned with actually conservative revenue projections that were based in reality, not on hopes and dreams.

180.    At the Company's 2014 annual meeting held on April 17, 2014, the Company's stockholders approved an amendment to the Fifth Amended and Restated Certificate of Incorporation, increasing the number of authorized shares of common stock from 75,000,000 to 150,000,000.  This paved the way for the closing of the full amount of securities in the Private Placement Transaction, which closed on April 22, 2014.  The Private Placement Transaction raised more cash that the Company simply burned through.

181.    The Company's revenues continued to fall during the second quarter 2014 and, in fact, fell well below even the reduced level Defendant Reali forecasted to the Board in April in his Revised 2014 Budget.   The Company's second quarter 2014 revenue totaled a mere $4.7 million, or $2.4 million (34%) less than the $7.1 million, Defendant Reali's Revised 2014 Budget unreasonably projected for the second quarter 2014.  Quarterly cash burn was nearly $6 million and, as of June 30, 2014, the Company only had about $2.3 million of available cash.

182.    Having no adequate long term capitalization plan or ability to raise enough funds, on November 12, 2014 (the "Petition Date"), the Company filed a voluntary petition for relief under chapter 11 the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  During the course of the bankruptcy proceedings at the end of January and beginning of February, 2015, all of the Company's operating assets were sold and the proceeds were used to repay the secured debt to Hercules and pay (or escrow for future payment) Administrative Claims.

183.    On July 24, 2015, the Bankruptcy Court entered an Order confirming the second amended chapter 11 plan of reorganization (the "Plan").  Pursuant to the Plan all of the Company's remaining assets, including cash, accounts receivable and certain potential "Causes of Action" as defined under the Plan were vested in a Liquidating Trust and the Plaintiff was appointed the Liquidation Trustee with the task of prosecuting any viable Causes of Action.

**J.**      **Defendants' Concealment and No Right to Indemnification**

184.    The information alleged in this Complaint was concealed from public knowledge and unavailable to Plaintiff until, at the very earliest, Plaintiff was retained as the Company's Chief Restructuring Officer on November 14, 2014.  Shortly after the Company's bankruptcy Plan was approved by the Court on July 24, 2015, and Plaintiff was appointed Liquidation Trustee, Plaintiff immediately retained outside counsel to investigate the potential claims alleged herein. As such, Plaintiff alleges that any statute of limitations or laches period, to the extent Defendants raise either as an affirmative defense, should be equitably tolled until at least November 14, 2014.  Plaintiff has acted diligently in investigating and prosecuting the claims alleged herein.

185.    Defendants are not entitled to indemnification from the Company or the presumption that their actions alleged below are protected by business judgment. All of the Company's liabilities were discharged in bankruptcy and Plaintiff has no obligation to indemnify Defendants.   Moreover, Defendants' actions constituted gross negligence, if not a reckless disregard for the consequences of those actions, and Defendants violated their duty of loyalty.

**Count I**
**Breach of Fiduciary Duties of Care and Loyalty Prior to Decision to Pursue Baxano**
**(Defendants Reali & Slattery)**

186.    Plaintiff incorporates paragraphs 1 through 86 and 184-185 above, as if fully set forth herein.

187.    As the President and Chief Executive Officer of the Company, Defendant Reali owed the Company and its stakeholders the highest duties of loyalty and care in conducting the Company's affairs.  As the Chief Financial Officer of the Company, Defendant Slattery also owed these same fiduciary duties to the Company and its stakeholders.

188.    As part of their duties of care and loyalty, the Defendants were required to keep the Company's Board of Directors fully and timely informed regarding the Company's reasonably achievable future prospects, and to act with due care and good faith in doing so.

189.    To discharge these duties, Defendants were required to, among other things, not act with deliberate indifference to known circumstances and not make assumptions outside the bounds of reason in preparing and providing to the Board and the Company's advisors future projections of the Company's revenue and revenue growth.  Thus, all projections prepared by Defendants should have had a reasonable basis in light of the Company's historical results, current circumstances and known challenges.

190.    Additionally, Defendants' duties required them to refrain from preparing forecasts, and providing misinformation to the Board, that served their self-interest rather than the interests of the Company.  Defendants' fulfillment of these duties was essential so that the Board members that depend upon that information could make their own fully informed decisions.

191.    Defendants breached these fiduciary duties in preparing and presenting to the Board the 2012 Budget, 2012 Long Range Plan, and 2012 Updated Budget because they relied on revenue and revenue growth projections that were outside the bounds of reason and Defendants were recklessly indifferent to the consequences of those inflated revenue projections to the Board, particularly given the Company's declining revenues, lack of adequate capitalization, high rate of cash burn, increasing losses of revenue and customers for its key product, and the long term difficulties in solving those problems.

192.    Had Defendants properly advised the Board of the Company's true diminished future prospects, or that their future projections lacked a reasonable basis, the Board would have known to adequately consider whether to, and could have, right sized the Company in a manner

appropriate for its reasonably expected reduced revenue levels. This would have preserved a substantial portion of the Company's assets and market capitalization, capped its accumulated deficit, and eliminated the need to eventually enter into a secured credit facility in December 2013.

193.    As a result of Defendants' breaches of duty, the Company was harmed because the Board did not undertake, and did not know that they needed to undertake, measures to right-size the Company. Specifically, the damages from the failure to right size the Company occasioned by Defendants' breaches of fiduciary duty can be measured based on the Company's: (1) total amount of cash burn from operations for the period May 2012 through the filing of bankruptcy less the amount of reduced cash burn had the Company's cost structure been reorganized in a manner appropriate to for the Company's actual revenue levels and downward AxiaLIF revenue trends; (2) the difference between the value of the Company's assets as of May 2012 and the net amount the Company recovered from the sale of those same assets in the bankruptcy; and/or (3) the amount of debt and unpaid trade debt the Company accumulated from the period May 2012 until the filing of bankruptcy.

### Count II
### Breach of Fiduciary Duties of Care and Loyalty Leading to, and in Connection with, the Baxano Transaction
### (Defendants Reali & Slattery)

194.    Plaintiff incorporates paragraphs 1 through 134 and 184-185 above, as if fully set forth herein.

195.    Defendants Reali and Slattery owed the fiduciary duties of loyalty and due care described herein.

196.    As further alleged above, Defendants breached these fiduciary duties in late 2012 and through mid-2013 by, among other things, providing the Board with unreasonable and

unachievable revenue and revenue growth projections of the stand-alone and combined Company's future revenue and revenue growth prospects and withholding adverse information regarding the channel stuffing nature of Baxano's inflated fourth quarter 2012 revenues, all of which Defendants knew or should have known would be critical to the Board's decision of whether to acquire Baxano or instead restructure and right size the Company in a manner appropriate for its actually achievable level of expected revenues.

197.    Defendants' future revenue and revenue growth projections in the 2012 Budget, Revised 2012 Budget, 2012 Long Range Plan, Updated 2012 Long Range Plan, and 2013 Budget, as well as the Pro Forma Projections for the combined Company, all of which were beyond the bounds of reason and prepared with reckless indifference to the Company's known circumstances, had the effect of tempering the Board's view of the Company's deteriorated financial condition and true diminished future prospects (as a result of the collapsed AxiaLIF product line and loss of the customer base) in favor of the viability of Defendants' strategy to acquire Baxano in a gambit to resolve the Company's various financial difficulties. Having perceived the combined Company's future prospects as bright, the Board was inclined to acquire Baxano and did not adequately consider restructuring and right-sizing the Company, which would have saved a substantial part of its assets, cash flow and value.

198.    Instead, Defendants' actions caused a massive destruction in the value of the Company's assets. Specifically, the damages from the failure to right size the Company occasioned by Defendants' breaches of fiduciary duty can be measured based on the Company's: (1) total amount of cash burn from operations for the period November 1, 2012 through the filing of bankruptcy less the amount of reduced cash burn had the Company's cost structure been reorganized in a manner appropriate to for the Company's actual revenue levels and downward AxiaLIF revenue trends; (2) the difference between the value of the Company's assets as of

November 1, 2012 and the net amount the Company recovered from the sale of those same assets in the bankruptcy; and/or (3) the amount of debt and unpaid trade debt the Company accumulated from the period November 1, 2012 until the filing of bankruptcy.

199.    But for Defendants' breaches of their fiduciary duties, the Baxano merger would not have occurred and a substantial portion of the Company's assets, market valuation and cash flow could have been saved.

### Count III
### Breach of Fiduciary Duties of Care and Loyalty Leading Up To, And In Connection With, The Hercules Transaction & Related Waste of Company Assets
### (Defendants Reali & Slattery)

200.    Plaintiff incorporates and alleges paragraphs 1 through 166 and 184-185 above, as if fully set forth herein.

201.    Following the Baxano transaction, Defendants continued to owe the fiduciary duties of loyalty and due care described herein.  Defendants also had the fiduciary duty not to waste the Company's assets or knowingly permit them to be wasted.

202.    As further alleged above, Defendants breached these fiduciary duties by, among other things, continuing to provide the Board with unreasonable and unachievable revenue and revenue growth projections for the combined Company, all of which Defendants knew or should have known would be critical to the Board's decision of whether to restructure and right size the Company after acquiring Baxano (in light of reduced revenue levels for the combined entity) or continue to raise cash and incur debt.

203.    Defendants' continued presentation of inflated future revenue and revenue growth projections to the Board during the third and fourth quarters of 2013 after the Baxano transaction, notwithstanding the declining revenue results that were occurring, also were beyond the bounds of reason and made with reckless indifference to the Company's known

circumstances.  These continued unreasonable future revenue and revenue growth projections had the continued effect of tempering the Board's view of the Company's deteriorated financial condition and true diminished future prospects.  As a result, the Board did not adequately consider restructuring and right sizing the Company.

204.   Instead, having still perceived the combined Company's future prospects as brighter than they actually were, the Board authorized Defendant Reali to complete the Hercules credit facility that was secured against all of the Company's assets at a time when the Company's revenues, and reasonably achievable future revenues, were not adequate to repay the Hercules credit facility, particularly since the Company lacked an adequate long term capitalization plan. Authorizing Defendant Reali's strategy to obtain a credit facility from Hercules, and an additional line of equity finance from Lincoln Park, assured that the Company would finish the year with enough available cash so that Defendant Reali could earn the cash component of his 2013 Cash Bonus Plan compensation -- a payment to Defendant Reali of $50,000.

205.   In addition, during 2013, Defendants undertook an expensive, entirely unnecessary and self-interested relocation of the Company's headquarters from Wilmington, North Carolina to Raleigh, North Carolina, at a time when the Company did not have the resources to do so.  Among other costs, this resulted in a number of severance payments, and simultaneous additional leasehold payments.  This relocation wasted the Company's assets, was designed to serve Defendants' interests and not entirely fair to the Company.

206.   Thus, Defendants' actions further diminished the value of the Company and its assets.  Specifically, the damages from the failure to right size the Company occasioned by Defendants' breaches of fiduciary duty can be measured based on the Company's: (1) total amount of cash burn from operations for the periods August 7, 2013 or October 30, 2013 through the filing of bankruptcy less the amount of reduced cash burn had the Company's cost structure

been reorganized in a manner appropriate for the Company's actual revenue levels and downward AxiaLIF revenue trends; (2) the difference between the value of the Company's assets as of August 7, 2013 or October 30, 2013 and the net amount the Company recovered from the sale of those same assets in the bankruptcy; and/or (3) the amount of debt and unpaid trade debt the Company accumulated from the periods August 7, 2013 or October 30, 2013 until the filing of bankruptcy.

207.   But for Defendants' breaches of their fiduciary duties, the Company would not have entered into the Hercules credit facility which was secured against all of the Company's assets and a substantial portion of the Company's assets, market valuation and cash flow could have been saved and the Company's expenses would have been substantially lower.  Indeed, by causing the Company to draw down on the fully secured Hercules credit facility, without the ability to repay it, Defendants encumbered the Company's assets and reduced the value of the Company.

**Count IV**
**Breach of Fiduciary Duties of Loyalty and Care Leading Up to Bankruptcy Filing**
**(Defendant Reali Only)**

208.   Plaintiff incorporates and alleges paragraphs 1 through 185, above as if fully set forth herein.

209.   Defendant Reali had the continuing fiduciary duties to the Company of loyalty and care as described herein after the credit facility with Hercules.

210.   In light of the Company's then-greatly deteriorated financial condition, lack of adequate cash, lack of an adequate long term capitalization plan, and increased rate of cash burn, Defendant Reali breached these duties through his continued presentation of inflated future revenue and revenue growth projections to the Board during the first and second quarters of 2014, notwithstanding that the Company's downward revenue trend was continuing.  As such,

Defendant Reali's unreasonable revenue projections, made with reckless indifference to the Company's known circumstances, had the continued effect of delaying the Board's decision to restructure and downsize the Company until it was too late and the Company was forced to file for bankruptcy protection and sell its assets to repay its secured lender, Hercules.

211.    As a result of Defendant Reali's breaches of duty, the Company was harmed because the Board did not timely undertake measures to restructure and right-size the Company. Had Defendant Reali fully informed the Board of the Company's true diminished prospects in a timely manner, the Board could have made the appropriate, fully informed decision, at a time it still had enough cash to operate at a much reduced level and within the revenue level it was achieving and the gross profit it was earning.  This would have eliminated the Company's cash burn, preserved cash and saved some of the value of the Company and its assets.

212.    But for Defendant Reali's breach of his fiduciary duties, a substantial portion of the Company's assets, market valuation and cash flow could have been saved and the Company's expenses would have been substantially lower.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor as follows:

a.  Declaring that the Defendants breached their fiduciary duties to the Company;

b.  Awarding Plaintiff the damages caused by Defendants' conduct in an amount proven at trial and Directing Defendants to pay such damages to Plaintiff, along with any pre- and post-judgment interest at the highest rate allowed by law;

c.  Disgorgement and recovery by Plaintiff of all cash bonuses and any retention payments paid to Defendants by the Company during 2012, 2013 and 2014;

d.  Awarding Plaintiff the costs and disbursements of this action, and investigation relating thereto, along with reasonable attorneys' and expert fees, costs and expenses; and

e.  Granting Plaintiff such other and further relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.

ROSENTHAL, MONHAIT & GODDESS, P.A.

Jessica Zeldin (Del. Bar No. 3558)
919 Market Street, Suite 1401
P. O. Box 1070
Wilmington, DE 19899-1070
(302)656-4433
jzeldin@rmgglaw.com

OF COUNSEL:

James M. Evangelista
David J. Worley
HARRIS PENN LOWRY LLP
400 Colony Square, Suite 900
1201 Peachtree Street, NE
Atlanta, GA  30361
(404)961-7650
jim@hpllegal.com
david@hpllegal.com

October 30, 2015