## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN L. PALMER, AS LIQUIDATION TRUSTEE FOR THE BAXANO LIQUIDATION TRUST, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civ. No. 15-994-SLR |
| KENNETH REALI and JOSEPH P. SLATTERY, | ) ) |
| | ) |
| Defendants. | ) |

Jessica Zeldin, Esquire of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: James M. Evangelista, Esquire of Harris Penn Lowry LLP.

Peter J. Walsh, Jr., Esquire and Jonathan A. Choa, Esquire of Potter Anderson & Corroon, LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: John F. Cannon, Esquire, Stephen L. Ram, Esquire, and Aaron C. Humes, Esquire of Stradling Yocca Carlson & Rauth, P.C.

## MEMORANDUM OPINION

Dated: September 29, 2016
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Plaintiff John Palmer ("plaintiff") is the liquidation trustee for the Baxano Liquidation Trust ("the Trust"). On October 30, 2015, plaintiff filed a complaint alleging that defendants Kenneth Reali ("Reali") and Joseph Slattery ("Slattery") (collectively "defendants"), as officers of Baxano Surgical, Inc. ("Baxano"), breached their fiduciary duties of loyalty and care. (D.I. 1 at ¶¶ 2-6) Plaintiff also alleges that defendants' actions constituted waste of corporate assets. (D.I. 1 at ¶ 205) Presently before the court is defendants' motion to dismiss the complaint. (D.I. 6) The court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 1332.

## II. BACKGROUND

The Trust is the successor in interest to Baxano, resulting from the latter's reorganization under Chapter 11 of the Bankruptcy Code. (D.I. 1 at ¶ 183) The relevant corporate history of the debtor includes a Delaware corporation founded in 2000 as "XiaMed, Inc.," which subsequently changed its name to "TranS1, Inc." in 2003 ("the Company"). The Company's primary line of business was the "AxiaLIF" line of surgical instruments and implant products designed for use in spinal surgery. (D.I. 1 at ¶ 18) As revenues grew, so did the Company and, in October 2007, the Company went public, raising $86.7 million from the sale of 10,793,165 shares of common stock at $15 a share. (D.I. 8, ex. 1 at 59)

By 2009, revenues had peaked at $29.8 million. That year, however, two events changed the course of the Company's growth. First, in January 2009, the American Medical Association changed the Current Procedural Technology ("CPT") billing reimbursement code associated with AxiaLIF procedures to a "T" code, which represented an experimental procedure. The change in CPT code to "experimental"

meant that insurers would not reimburse doctors for procedures employing the AxiaLIF product. Also, in May 2009, AxiaLIF received an unfavorable review at a national spine surgeon conference. (D.I. 1 at ¶¶ 18-20)

For 2010, the Company was forecast to generate $33.1 million in revenue. (D.I. 1 at ¶ 21) In January 2010, Reali joined the Company as President and Chief Operating Officer. (D.I. 1 at ¶ 15) Slattery joined as Chief Financial Officer in April. (D.I. 1 at ¶ 16) The Company closed the year with revenues of $26.2 million, which was 26.8% lower than the revenue forecast and a 12.4% drop from 2009. (D.I. 1 at ¶ 21) The Company's share price in December 2010 was $1.76. (D.I. 1 at ¶ 22) At the end of December 2010, the Company had $42.5 million in cash, which allowed it to continue its operations without major changes in revenues or expenses for eight financial quarters or until early 2013. (D.I. 1 at ¶ 23)

The Company began 2011 with a revenue forecast of $30 million for the year. In January 2011, Reali also assumed the role of Chief Executive Officer and became a member of the Board of Directors (the "Board"). (D.I. 1 at ¶ 15) The base salaries for Reali and Slattery were raised to $360,000 and $293,550, respectively, with cash bonuses, under certain conditions, of 50% and 40% of their base salaries. (D.I. 1 at ¶ 32)

In May 2011, Reali conducted a survey of surgeons that uncovered a number of perceived challenges associated with the AxiaLIF product, including billing code reimbursement challenges, product efficacy, and potential surgical complications. Also in May 2011, a sealed *qui tam* false claims act lawsuit was filed against the Company.[1] The lawsuit alleged that, in order to obtain reimbursement for AxiaLIF procedures, the

---

[1] *See Caplin v. Trans1, Inc.*, Civ. No. 12-023 (E.D.N.C.)

Company had trained its customers to use incorrect CTP billing codes and to submit false claims and documents to Medicare and the North Carolina State Health Plan. (D.I. 1 at ¶¶ 25-26).

The Company filed a shelf registration for a secondary offering of stock in May 2011. In September, the Company was able to raise another $18.3 million in cash by selling 6.2 million shares of common stock at $3.25 per share. (D.I. 1 at ¶ 24) The following month, the United States Department of Health and Human Services, Office of Inspector General ("OIG"), began investigating AxiaLIF sales and surgeon training practices. (D.I. 1 at ¶ 27)

The Company finished 2011 with $19.1 million in revenues, which was a 27% drop, or $7 million, from 2010 revenues. (D.I. 1 at ¶ 30) Additionally, the Company underperformed management's $30 million revenue forecast by $11 million, or 36.4%. (D.I. 1 at ¶ 30) Fortunately, as a result of the secondary offering, the Company had $44.7 million in cash, which was sufficient to keep it in business for nine fiscal quarters, or until the spring of 2014. (D.I. 1 at ¶ 32) Absent the secondary offering, the Company would have only had $26.4 million in cash, which would have been sufficient to keep it in business for only five fiscal quarters, or until early 2013. (D.I. 1 at ¶ 32) Based upon the Company's dismal 2011 results, and despite missing revenue targets, Reali and Slattery earned $22,500 and $23,484, respectively, in cash bonuses. (D.I. 1 at ¶ 32)

The Company entered 2012 with a revised revenue forecast of $17.6 million for the year – for the first time, management was forecasting revenues to fall in comparison to the prior year, albeit by a modest $1.4 million from 2011. (D.I. 1 at ¶¶ 93, 107) At the same time, the Board raised base pay for Reali and Slattery to $370,000 and $298,443, respectively. (D.I. 1 at ¶ 33) Defendants also received "retention bonus" and other non-equity incentive payments of $189,975 and $120,091 respectively, as well as stock

3

options so that Reali received $912,775 in total compensation in 2012, and Slattery received total compensation of $690,701 that year.[2] (D.I. 1 at ¶ 33)

In April 2012, defendants began developing a long range plan for the Company based upon a set of growth forecasts. (D.I. 1 at ¶ 36) Plaintiff alleges that – in a series of e-mail exchanges – defendants discussed various options for these growth forecasts. (D.I. 1 at ¶¶ 37-45) Reali articulated a plan to expand the Company's portfolio by either adding a new product line or acquiring another business; however, Slattery expressed concerns that the Company was undercapitalized and that the acquisition/new product line "strategy is currently missing a capitalization plan that supports it." (D.I. 1 at ¶ 37)

In an April 23-24, 2012 e-mail exchange, defendants attempted to develop a forecast for AxiaLIF revenues. (D.I. 1 at ¶ 39) Slattery pushed for an AxiaLIF revenue growth rate above 30%, reasoning "I expect that anything less will not be accepted by the board given our investment plan, and performing less than that will be a big disappointment to investors who have waited for this day, and that will make fundraising next year more challenging." (D.I. 1 at ¶ 40) Reali argued for a 30% AxiaLIF revenue growth rate, explaining that the 2013 projections "feel[] more right to me **not from any quantifiable way** but just knowing what it will take to restart and the challenges in the spine market . . . **this is going to take time and money**." (D.I. 1 at ¶ 40 (emphasis added)).

Slattery explained the reasoning behind a long range forecast based upon 40% AxiaLIF case growth, which would, by December 2014, bring the "AxiaLIF case count [to] 184, which is pretty close to the run rate when you [Reali] joined." (D.I. 1 at ¶ 41)

_____

[2] It is unclear **when** these bonuses were paid and the stock options vested. Specifically, the complaint does not explain whether the 2012 retention bonuses were paid at the beginning of 2012, later in the year, or at some point in early 2013 after the defendants reported the 2012 financials to the Board.

4

At this point, Slattery was predicting 40% growth from a company that had experienced revenues falling by 26.8% and 27% respectively in the two prior years, 2010 and 2011. (D.I. 1 at ¶¶ 21, 30) In one of the April 2012 e-mails, Slattery said that the 40% growth rate was necessary for defendants to keep their jobs, "if we don't think we can grow this business 40% **then we don't have a license to hunt**. If it is going to be much less than that, then we don't have a compelling investment profile and **we need to rethink our cost structure**." (D.I. 1 at ¶ 41 (emphasis added))

During the April 2012 e-mail exchange, Reali ultimately assented to the higher 40% AxiaLIF growth forecast but then acknowledged in an e-mail that he knew the revenue forecast numbers lacked a reasonable basis. (D.I. 1 at ¶ 42) In one of the e-mails to Slattery, Reali instructed Slattery to "make damn sure the S&M [sales and marketing] spend is correct. . . . I would rather overemphasize this as I do feel we are going to need a lot of muscle to get us over the hump for many reasons and short changing this will not help us in the end. **I would rather be very realistic on this**." (D.I. 1 at ¶ 42 (emphasis added)) Plaintiff alleges that this statement reflects that defendants knew that they were not being very realistic with respect to other aspects of the long range plan, including future AxiaLIF revenue forecasts. (D.I. 1 at ¶ 42)

The forecasts discussed in the April 2012 e-mail exchange involved the Company losing money and raising cash in order to support operations; the required cash could be as low as $76 million and could easily become $100 million before the Company reached "cash break even." (D.I. 1 at ¶ 43) Slattery ultimately assembled a "punchline" forecast concluding in a lower cash requirement, based upon the higher AxiaLIF revenue projections in which the Company would "need to raise $62M over the years[] and . . . another $14M proceeds from stock options." (D.I. 1 at ¶ 43) Defendants provided the final long range plan ("May 2012 Plan") to the Board on May 3, 2012. (D.I. 1 at ¶ 45) In addition to a revenue forecast for 2012 of $17.6 million, the

5

revenue forecast for 2013-2017 predicted 58.9% growth in 2013, 32.6% growth in 2014, 34% growth in 2015, 34.8% growth in 2016, and 34.7% growth in 2017. (D.I. 1 at ¶ 45) The May 2012 Plan predicted that the Company would become profitable in 2017. (D.I. 1 at ¶ 45)

Defendants also presented their forecasts to the Board in an accompanying PowerPoint presentation ("2012 Forecast"). In the 2012 Forecast, defendants presented a variety of negative information, including requirements to raise cash, challenges to selling AxiaLIF products, a potential "going concern" opinion from the corporate auditors, and the ongoing OIG inquiry. (D.I. 1 at ¶¶ 47-53) Additionally, defendants presented three scenarios for the Company's future revenues, expenses, and cash requirements. (D.I. 1 at ¶ 54) The three scenarios included a "base case," a "downside case," and an "upside case." (D.I. 1 at ¶ 54)

The "base case" included revenue assumptions similar to the aforementioned May 2012 Plan, with AxiaLIF revenues growing 49% in 2013 and 35% each year from 2014 through 2017. The base case required the Company to raise approximately $80 million in cash through 2015. (D.I. 1 at ¶ 55) As of early 2012, absent any great increases in expenses or drops in revenues, the Company had sufficient cash to survive another two years, until the spring of 2014. (D.I. 1 at ¶ 32)

Defendants appear to have included additional scenarios in the 2012 Forecast to support the conclusion that the "base case" scenario was the most reasonable forecast for the Company. (D.I. 1 at ¶¶ 54-57) For example, the "downside case" did not include specific forecasts or revenue numbers but attempted to account for a "slow decline"[3] of AxiaLIF revenues. (D.I. 1 at ¶ 56) The "downside case" required the Company to raise

_____

[3] Actual AxiaLIF revenues had declined 12.1% in 2010 and 27.1% in 2011, which was far greater than a "slow decline." (D.I. 1 at ¶¶ 21, 30)

$97 million in cash in order to remain in operation through 2016. (D.I. 1 at ¶ 56) Meanwhile, the "upside case" also did not include specific revenue forecasts, even though it was said to assume faster revenue growth than the base case. (D.I. 1 at ¶ 57) Defendants estimated that the upside case would require the Company to raise $79 million in cash through 2015. (D.I. 1 at ¶ 57) To summarize, the 2012 Forecast presented a base case that required raising $80 million, an upside scenario that required raising essentially the same amount of money, namely $79 million, and a downside case that would require raising as much as $100 million.

Plaintiff alleges that defendants developed these forecasts and scenarios to justify raising close to $80 million in cash by likening the Company to a set of comparable medical device companies that were experiencing **growing revenues**, such as the revenues forecast in the May 2012 Plan. (D.I. 1 at ¶ 58) Plaintiff alleges that such comparable companies should have included those with **declining revenues** that would require raising significantly less cash than the amount forecast by defendants. (D.I. 1 at ¶ 58)

At numerous points in time, Slattery articulated concern about the Company's cash position and overall capitalization. For example, in a May 24, 2012 e-mail, Slattery warned Reali against relocating the Company to Raleigh, North Carolina, "given the cash situation." (D.I. 1 at ¶ 60) Slattery explained that a low share price could prevent the Company from raising cash altogether, and "the only friend we'll have is time, and that will be limited by our cash." (D.I. 1 at ¶ 60) Additionally, in a June 12, 2012 e-mail, Slattery proposed that "[w]e need to cast a wide net of how to keep this business capitalized." (D.I. 1 at ¶ 61)

As the summer of 2012 progressed, the Company suffered additional setbacks. First, in a July 25, 2015 e-mail, Slattery noted that revenues were lower than projected

7

while expenses were higher, which placed the Company's year-end 2012 cash position at $20.0-20.5 million, which was below the projected $22 million. (D.I. 1 at ¶ 66) Second, AxiaLIF cancellations reached a record 38% in June 2012. (D.I. 1 at ¶ 68).

Rather than propose a winding down of the Company in light of an ever-worsening financial picture, at an August 2, 2012 Board meeting, defendants presented an updated version of the May 2012 Plan ("August 2012 Plan"). (D.I. 1 at ¶ 71) In the August 2012 Plan, defendants lowered revenue projections for 2012 from $17.6 million to $14.7 million and increased projected revenue growth for 2013-2017, forecasting 65.3% growth in 2013, 72.4% for 2014, 66.2% in 2015, 54.5% for 2016, and $41.9% in 2017. (D.I. 1 at ¶ 71) In comparison with the forecasts presented three months earlier, the August 2012 Plan reflected significant upward revisions in the Company's projected revenues. (D.I. 1 at ¶¶ 45, 71) In the August 2012 Plan, defendants projected that corporate revenues would grow to $152.7 million in five years. (D.I. 1 at ¶ 71)

On August 23, 2012, the Board held a special meeting to discuss the possible acquisition of Baxano Surgical, Inc. ("BSI"). (D.I. 1 at ¶ 81) The Company engaged financial advisory firm Stifel, Nicholaus, Weisel ("Stifel") to act as the exclusive financial advisor to the Company in connection with its analysis of a potential acquisition of BSI and to provide the Board with a fairness opinion related to the proposed transaction. (D.I. 1 at ¶ 82) Stifel based its analyses on projections and other information provided by defendants and BSI's management. (D.I. 1 at ¶ 83) Based upon what appear to have been wildly inflated numbers, Stifel projected that the combined company's revenues would grow 150% in 2013, 100% in 2014, 67% in 2015, 47% in 2016, and 37% in 2017, with revenues reaching $248.8 million in 2017. (D.I. 1 at ¶ 84) In comparison with the projections in the August 2012 Plan, on a *pro forma* basis, the merger with Baxano would net nearly $100 million more revenues in 2017 and would be profitable two years earlier, in 2015. (D.I. 1 at ¶ 84)

8

On December 26, 2012, the Board negotiated and agreed to pay a $6 million settlement with OIG in relation to doctor training and billing practices.  (D.I. 1 at ¶ 96) The Company ended 2012 with $14.6 million in revenues, including a "risky" $1 million channel-stuffing transaction[4] with a Chinese company that only netted $500,000 in actual revenues.  (D.I. 1 at ¶¶ 93, 107)  Plaintiff contends that without the Chinese deal, the Company's 2012 performance would have missed the revised 2012 revenue projections from the August 2012 Plan.  (D.I. 1 at ¶ 94)  Based upon the OIG deal and other factors, the Company ended 2012 with $21.5 million in cash, which at then-current revenue and expense levels was sufficient for the Company to operate into the third quarter of 2013.  (D.I. 1 at ¶¶ 95-96)  Also, throughout 2012, the Company was inherently profitable, earning $10.3 million on revenue of $14.6 million, which amounted to a healthy 71% gross margin.  (D.I. 1 at ¶ 80)  The Company's operating loss was the result of $40 million in operating expenses, which plaintiff alleges presented a significant opportunity for cost cutting and right-sizing.  (D.I. 1 at ¶ 91)

For 2013, the Board increased Reali's base pay from $360,000 to $400,000. Slattery also received a material increase in his base pay.  (D.I. 1 at ¶¶ 134, 166) Compensation for defendants also included a 2013 Cash Bonus Plan[5] that consisted of: a variable revenue target for the Company (worth 50% of the bonus), an available cash component awarded if the minimum cash level was met at the end of the year (worth 25% of the bonus), and an individual performance target component (worth 25% of the bonus).  (D.I. 1 at ¶ 147)  For Reali, the total possible bonus under the 2013 Cash

---

[4] Channel stuffing is the practice of shipping products to distributors and booking the revenue, even if the distributor cannot sell the products and ultimately returns them a few months later.  This unethical (and potentially illegal) practice has long been used to reach sales quotas and to inflate revenues, albeit for the short time before the products are returned.

[5] Bonuses under the 2013 Cash Bonus Plan were not paid until March 11, 2014.  (D.I. 1 at ¶ 176)

Bonus Plan was $200,000, with the available cash component representing a $50,000 potential payment. (D.I. 1 at ¶ 147)

As the Company conducted its due diligence with respect to the BSI merger, Slattery anticipated that the combined company would need $10-15 million almost immediately after the merger. (*See generally* D.I. 1 at ¶¶ 97-105) Defendants also became aware that, as with the Company's own $1 million deal with a Chinese distributor, BSI had engaged in fourth quarter 2012 "channel-stuffing" transactions that materially misrepresented its revenues. (D.I. 1 at ¶ 101) Nonetheless, defendants reviewed the Company's fourth quarter 2012 financials with the Board in February 2013, and at no point did defendants revise their budgets or long range planning materials to account for the actual results from 2012.[6] Furthermore, defendants combined these financial reports and forecasts into a *pro forma* balance sheet and statement of operations for the combined company. (D.I. 1 at ¶ 111)

On March 3, 2013, BSI and the Company executed a merger agreement. (D.I. 1 at ¶ 116) The deal closed on May 31, 2013, and the Company changed its name to "Baxano Surgical, Inc." (D.I. 1 at ¶¶ 17, 132) On May 9, 2013, shortly before the deal closed, defendants announced first-quarter 2013 results, revised revenue guidance downward, and filed a proxy statement with the Securities and Exchange Commission

---

[6] Plaintiff alleges that it was unreasonable for the Company to include the entire $1 million Chinese distribution deal in the Company's 2012 revenues. (D.I. 1 at ¶ 108) Elsewhere, plaintiff asserts that the Company collected $500,000 from the same deal. (D.I. 1 at ¶ 94) Plaintiff's answer suggests that Generally Accepted Accounting Principles (GAAP) indicate that the revenue recognition was questionable, but plaintiff provides no indication as to what amount of the revenue should have been recognized. (D.I. 10 at 6 n.6)

("SEC") that included *pro forma* projections for revenues over the 2013-2017 timeframe.[7]  (*See* D.I. 1 at ¶¶ 120-123)

In March 2013, Reali had moved the Company into a 4,300 square foot office in Raleigh, North Carolina.  (D.I. 1 at ¶ 138)  At the time, the Company was obligated on a $21,300 monthly lease in Wilmington, North Carolina until December 2014, and the BSI facilities in San Jose, California cost $30,200 per month for a lease also running to December 2014.  (D.I. 1 at ¶ 139)  The initial 4,300 office cost Baxano more than $170,000 from July 2013 through November 2014.  (D.I. 1 at ¶ 138)  On June 30, 2013, Reali increased the space in Raleigh to 12,900 square feet, which resulted in an additional cost of $225,000 between July 2013 and November 2014.  (D.I. 1 at ¶ 138) In addition to the $395,000 in direct leasing costs for the Raleigh offices, Reali authorized money renovating and furnishing the Raleigh offices, and Baxano spent hundreds of thousands of dollars in severance and relocation expenses for certain employees.  (D.I. 1 at ¶ 140)  Plaintiff alleges this relocation was driven by self-interest, because both defendants lived in Raleigh, North Carolina at the time and had been commuting two hours, or 134 miles, each way to and from the Company's Wilmington, North Carolina offices.  (D.I. 1 at ¶ 141)

In August 2013, defendants announced Baxano's combined financial results for the second quarter of 2013 and further lowered 2013 revenue expectations to $23.5-25.5 million, which was 30% less than the $33.4 million reported in the corporate proxy statement three months earlier.  (D.I. 1 at ¶¶ 143-144).  The following month, Slattery resigned and received a severance payment.  (D.I. 1 at ¶ 145)

---

[7] The 2013-17 projections included annual revenue growth of 96.4% in 2014, 59% in 2015, 51% in 2016 and 43% in 2017.  (D.I. 1 at ¶ 123)

On October 16, 2013, Reali executed a term sheet to obtain up to $15 million in cash from Hercules Technology Growth Capital ("Hercules"). (D.I. 1 at ¶ 146)  Hercules' credit would be secured by a perfected first lien on all of Baxano's assets, including its intellectual property. (D.I. 1 at ¶ 146)  Baxano also entered into an equity financing arrangement with Lincoln Park that enabled it to sell up to $7.0 million in stock to Lincoln Park over a three year period. (D.I. 1 at ¶ 149)  At the October 2013 Board meeting, Reali presented revised growth forecasts that plaintiff contends were unreasonable and not supported by any facts. (D.I. 1 at ¶ 155)  In December 2013, Reali took an initial draw of $7.5 million from Hercules and was able to meet Baxano's $4.2 million available cash target for the end of 2013, thus entitling him to the full $50,000 available cash bonus and another $30,000 for meeting a portion of his personal achievement component for a total $80,000 cash payment. (D.I. 1 at ¶ 165)  Reali was also awarded $355,145 in stock options. (D.I. 1 at ¶ 166).

In February 2014, management reported 2013 financials to the Board, with fourth quarter 2013 revenues falling below the $6 million required for subsequent draws from Hercules.  Available cash fell to $9.1 million, which was a 79% decrease from the $40.8 million predicted in the May 2013 proxy statement. (D.I. 1 at ¶ 169)  During the February 2014 Board meeting, Reali presented a 2014 Budget containing a revised revenue forecast showing revenue growth that plaintiff also contend lacked a reasonable basis. (D.I. 1 at ¶ 171)

Based upon these forecasts and other representations made by Reali, the Board allowed Baxano to continue to operate and to borrow money. (D.I. 1 at ¶¶ 172-176)  The borrowing included securities agreements with Sabby Capital and DAFNA. (D.I. 1 at ¶ 173)  In March 2014, Reali authorized payments of 2013 bonuses, including his own $80,000 bonus, from the cash received from Sabby Capital and DAFNA. (D.I. 1 at

¶ 176)  In April 2014, Reali leased an additional 6,329 square feet of office space in Raleigh at the added cost of $10,600 per month.  (D.I. 1 at ¶ 178)

During 2014, revenues continued to fall below forecasts and, in April 2014, Baxano issued additional shares of common stock to raise money for operations.  (D.I. 1 at ¶ 180)  The added funds continued operations but were insufficient to stem the losses from ongoing operations and, in November 2014, Baxano filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware.  (D.I. 1 at ¶ 182)

## III. MOTION TO DISMISS

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)).  Consistent with the Supreme Court's rulings in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a three-part analysis when reviewing a Rule 12(b)(6) motion. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d. Cir. 2016).  In the first step, the court "must tak[e] note of the elements a plaintiff must plead to state a claim."  Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth."  Lastly, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (citations omitted).

13

Under *Twombly* and *Iqbal*, the complaint must sufficiently show that the pleader has a plausible claim. *McDermott v. Clondalkin Grp.*, Civ. No. 15-2782, 2016 WL 2893844, at \*3 (3d Cir. May 18, 2016). Although "an exposition of [the] legal argument" is unnecessary, *Skinner v. Switzer*, 562 U.S. 521 (2011), a complaint should provide reasonable notice under the circumstances. *Id.* at 530. A filed pleading must be "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," such that "the factual contents have evidentiary support, or if so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." *Anderson v. Bd. of Sch. Directors of Millcreek Twp. Sch. Dist.*, 574 F. App'x 169, 174 (3d Cir. 2014) (quoting Fed. R. Civ. P. 11(b)). So long as plaintiff do not use "boilerplate and conclusory allegations" and "accompany their legal theory with factual allegations that make their theoretically viable claim plausible," the Third Circuit has held "pleading upon information and belief [to be] permissible [w]here it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control." *McDermott*, 2016 WL 2893844, at \*4 (quotation marks, citation, and emphasis omitted).

As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

14

## IV. DISCUSSION

### A. Breach of Fiduciary Duties

In the case at bar, plaintiff alleges that defendants breached their fiduciary duties of loyalty and care by repeatedly providing the Board with "unreasonable, inflated and unachievable future revenue and revenue growth projections" when defendants knew that the projections would be critical to strategic Board decisions about the future of the company when revenues were falling, expenses were rising, and capitalization issues dominated corporate planning. Plaintiff also alleges that defendants' actions were driven by their self-interest, including maintaining a level of expenses to justify their compensation and undertaking a costly relocation of corporate headquarters to reduce their commutes. Plaintiff further alleges that, at numerous points in time, defendants' forecasts led the Board away from options such as "restructuring and right-sizing the Company" by drastically reducing expenses "in a manner appropriate to the Company's actual revenue levels and realistically achievable future revenue." (See D.I. 1 at ¶ 2-9)

Defendants argue that plaintiff fails to state a claim, because the complaint does not rise to the level of a breach of fiduciary duty. For example, defendants argues that a claim for the breach of the duty of care requires "a showing of gross negligence which generally requires directors and officers to fail to inform themselves fully and a deliberate manner." Defendants also argue that "a claim for the breach of the duty of loyalty requires a showing that a fiduciary was on both sides of a transaction and that the transaction was not entirely fair to the company." (D.I. 7 at 11 (internal citation and quotation marks omitted)) Defendants contend that the business judgment rule

precludes recovery[8] and that financial projections are inherently risky and cannot support a claim of breach of fiduciary duty. (D.I. 7 at 11-12, 15)

"A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010). In Delaware, corporate officers, "like directors, owe fiduciary duties of care and loyalty, and [] the fiduciary duties of officers are the same as those of directors." *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).

A claim for the breach of the fiduciary duty of care is "actionable only if [] directors' actions are grossly negligent." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005). Under the duty of care, directors are required to "use that amount of care which ordinarily careful and prudent [people] would use in similar circumstances," and to make business decisions by "consider[ing] all material information reasonably available." *Id.* A claim for the breach of the fiduciary duty of loyalty requires "a director, officer or controlling shareholder," *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), to act upon an interest that takes precedence over "the best interest of the corporation and its shareholders." *Id.*

### 1. Count I: Breach of fiduciary duties of care and loyalty prior to decision to pursue BSI

#### a. Duty of care

Plaintiff alleges that defendants breached their duties of care in constructing forecasts and presenting these forecasts to the Board in the May 2012 Plan and the

---

[8] Defendants have cited to no cases where a Delaware court has held that the business judgment rule applies to corporate **officers**; therefore, the court will not address the business judgment rule or the pleading standard articulated by *In re Tower Air*, 416 F.3d 229 (3d Cir. 2005).

2012 Forecast.  Plaintiff alleges that defendants were grossly negligent, because the forecasts lacked a reasonable basis.  For example, after the Company's revenues fell in 2010 and 2011, Reali agreed to a 40% annual growth forecast in the May 2012 Plan, in part because Slattery pointed out that the 40% growth rate was necessary for defendants to keep their jobs:  "[I]f we don't think we can grow this business 40% **then we don't have a license to hunt**.  If it is going to be much less than that, then we don't have a compelling investment profile and **we need to rethink our cost structure**."  (D.I. 1 at ¶ 41 (emphasis added))  At the same time, Reali instructed Slattery to project the sales and marketing expenses for the May 2012 Plan and to "**be very realistic on this**."  (D.I. 1 at ¶ 41)

Further, plaintiff alleges that – in developing the May 2012 Plan and 2012 Forecast – a reasonable person would have compared the Company to other medical device companies that were experiencing declining revenues, not the companies with growing revenues defendants identified in the May 2012 Plan.  (D.I. 1 at ¶ 58)  Plaintiff also alleges that defendants knew that the projected revenues presented to the Board in the August 2012 Plan did not have a reasonable basis in fact.  (D.I. 1 at ¶ 75)

These facts as pled plausibly give rise to an entitlement for relief for breach of the duty of care.  In the time during 2012 before the decision to pursue the BSI merger, defendants presented a series of forecasts with no reasonable basis in fact that showed the Company growing at a rate in excess of 40% annually.  Indeed, all evidence indicated that revenues were falling by close to 20% per year.[9]

---

[9] Revenues fell 12.1% in 2010 and 27.1% in 2011, for an average drop of 20% per year for that two year period.

### b. Duty of loyalty

In the case at bar, plaintiff alleges that in the April 2012 e-mail exchange, defendants understood that the implications of the Board re-thinking the Company's cost structure would most likely result in a substantial reduction to defendants' compensation and cash bonuses. Plaintiff further alleges that as of the August 2012 Board meeting, defendants (or others) could have "right sized" the Company, cut expenses, retained cash, and preserved shareholder equity. Plaintiff alleges that defendants breached the duty of loyalty when they placed an interest in personal compensation above the best interest of the corporation, which may have included reducing the size of the Company, right-sizing the Company, and otherwise reducing expenses. (D.I. 1 at ¶ 77-80) In the period before the BSI merger, the facts as pled plausibly demonstrate that defendants placed their own interest in receiving compensation over the best interest of the Company and its shareholders.

### 2. Count II: Breach of fiduciary duties of care and loyalty leading to, and in connection with, the BSI merger

#### a. Duty of care

In connection with the BSI merger, plaintiff alleges that defendants knew that the *pro forma* revenue growth projections were not reasonably achievable and, therefore, lacked a reasonable basis. (D.I. 1 at ¶ 85) Plaintiff also alleges that, as early as January 2013, defendants either knew or should have known that BSI's revenues were not growing. For example, in September and October 2012, BSI had missed its revenue forecasts, and in the fourth quarter of 2012, BSI had engaged in channel-stuffing transactions. (D.I. 1 at ¶ 101) Plaintiff further contends that defendants knew that the Company's own forecasts as well as the *pro forma* projections for the combined company were unreasonable and unrealistic and that the Board, therefore, was misinformed about the Company's condition and the prospects for the merger with BSI.

18

(D.I. 1 at ¶ 110) These facts plausibly give rise to an entitlement for relief for breach of the duty of care because, in connection with the BSI merger, defendants presented a series of Company and *pro forma* forecasts with no reasonable basis in fact that showed the Company growing when defendants knew the Company was not growing.

### b. Duty of loyalty

Plaintiff alleges that, in connection with the BSI merger, defendants were motivated to present Company and *pro forma* forecasts that had no reasonable basis in fact, because defendants wished to continue to receive increasing compensation and bonuses. (*See, e.g.*, D.I. 1 at ¶ 134) Plaintiff also alleges that Reali relocated the Company to Raleigh, North Carolina for reasons driven by self-interest, because both defendants lived in Raleigh, North Carolina at the time. (D.I. 1 at ¶ 141) Taking the facts as pled as true, these facts plausibly indicate that defendants' interests in receiving compensation and shortening their commuting time took precedence over the best interests of the Company and its shareholders.

### 3. Count III: Breach of fiduciary duties of care and loyalty leading up to, and in connection with, the Hercules transaction and related waste of corporate assets

### a. Duty of care

In connection with the Hercules transaction, plaintiff alleges that the forecasts included in the May 2013 proxy statement, which predicted 96.4% revenue growth in 2014, 59% in 2015, 51% in 2016 and 43% in 2017, lacked any reasonable basis, especially considering that defendants had lowered their 2013 revenue guidance the same day.[10] (D.I. 1 at ¶¶ 120, 123) Plaintiff also alleges that Reali presented the Board

---

[10] The revised guidance was: "For the full fiscal year 2013, on a pro forma basis for the combined companies, the Company now expects total revenues in the range of $25 - $29 million versus prior guidance of $28 - $32 million." (D.I. 1 at ¶ 120)

with additional forecasts that had no basis in fact and that Reali failed to inform the Board that revenues were falling.  (D.I. 1 at ¶¶ 157-64)  The facts as pled plausibly indicate that the forecasts in the May 2013 proxy statement and as used in connection with the Hercules transaction lacked a reasonable basis.

### b.  Duty of loyalty

Plaintiff alleges that Reali's primary motivation in entering into the Hercules credit facility was to continue his lucrative employment and to secure additional bonuses and stock options.  (D.I. 1 at ¶¶ 147, 165)  The facts as pled plausibly suggest that Reali borrowed money from Hercules to meet Baxano's "available cash" target for the end of 2013, for which Reali earned a $50,000 bonus.

### 4.  Count IV: Breach of fiduciary duties of loyalty and care leading up to bankruptcy filing

### a.  Duty of care

Baxano ended 2013 with *pro forma* revenues of $23.3 million, which was less than the 2012 *pro forma* revenues of $24 million.  (D.I. 1 at ¶ 168)  Plaintiff alleges that the continued failure to meet revenue targets indicated that there were numerous points in time, at the end of 2013 and into 2014, when Reali could have wound down the company.  Instead, plaintiff alleges that Reali sold securities, sold stock, and borrowed money to continue operations through November 2014.  During this time, Reali paid bonuses, increased expenses, and leased additional office space.  The facts as pled plausibly indicate that Reali did not make business decisions using the amount of care that ordinarily careful and prudent people would use in similar circumstances.

### b.  Duty of loyalty

Plaintiff alleges that Reali breached his duty of loyalty by placing his interest in his own compensation over the best interests of the Baxano and its shareholders.  In

support of this allegation, plaintiff presents facts that Reali misrepresented the future prospects of Baxano to the Board, to various creditors, and to the public. Plaintiff alleges that Reali was motivated by his compensation and that he placed his interest in receiving bonuses over the interests of Baxano and its shareholders. For example, plaintiff alleges that Reali borrowed money from Sabby Capital and DAFNA to pay bonuses, including an \$80,000 bonus to himself. (D.I. 1 at ¶ 176) The facts as pled plausibly suggest that Reali, placed his own interest in compensation over the best interests of Baxano and its shareholders.

## B. Waste

A claim of waste refers to "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *White v. Panic*, 783 A.2d 543, 554 (Del.2001) (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)). "To prevail on a waste claim . . . the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *Id.* at 554 n. 36. "[T]he decision must go so far beyond the bounds of reasonable business judgment that its only explanation is bad faith." *Stanziale v. Nachtomi* (In re Tower Air, Inc.), 416 F.3d 229, 238 (3d Cir. 2005).

In the case at bar, plaintiff argues that defendants' relocation of the Company to Raleigh, North Carolina wasted corporate assets. (D.I. 1 at ¶ 205) Plaintiff contends that, after the BSI merger, Baxano was obligated on two leases running to December 2014 and that cost approximately \$51,500 per month for offices in Wilmington, North Carolina and San Jose, California. Plaintiff asserts that defendants leased office space in Raleigh at an initial cost of \$10,000 per month, with space rapidly growing to cost

$25,000 per month by July 2013.  Additionally, plaintiff claims that relocation cost Baxano hundreds of thousands of dollars in severance, relocation, renovation, decorating, and furnishing expenses.  (D.I. 1 at ¶¶ 138-40)  There appears to be no reasonable business purpose for the relocation, and even Slattery, as early as May 2012, recommended against the relocation "given the cash situation."  (D.I. 1 at ¶ 60) The facts as pled plausibly support a claim of corporate waste.

## II. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss (D.I. 6) is denied.  An appropriate order shall issue.